OPINION UPON RECONSIDERATION
{¶ 1} The instant appeal emanates from a final judgment of the Trumbull County Court of Common Pleas. Appellant, Nathaniel Jackson, seeks the reversal of the trial court's decision to dismiss his original and amended petitions for postconviction relief from his underlying criminal conviction. For the following reasons, this court holds that appellant has failed to demonstrate any reversible error.
 {¶ 2} In November 2002, following a jury trial of approximately four weeks, appellant was found guilty of two counts of aggravated murder, one count of aggravated burglary, and one count of aggravated robbery. Under both of the aggravated murder counts, the jury also returned a guilty verdict on two death penalty specifications. In addition, under each of the aggravated burglary and aggravated robbery counts, he was found guilty of a firearm specification.
 {¶ 3} The foregoing charges against appellant were based upon the shooting death of Robert S. Fingerhut in December 2001. At the time of his death, Fingerhut was residing with his former wife, Donna Roberts, at a home in Howland Township, Ohio. During the months prior to the incident, Roberts had been exchanging letters with appellant while he was being held in a state prison on a prior criminal offense. As part of these letters, Roberts and appellant specifically discussed a plan under which appellant would murder Fingerhut so that Roberts could collect the proceeds from Fingerhut's insurance policies.
 {¶ 4} Appellant was released from prison on December 9, 2001. Just two days later, the local police responded to a 9-1-1 call which Roberts had placed from the home she shared with Fingerhut. Once the police had arrived at the scene, Roberts informed them that when she had returned home that evening, she had found Fingerhut dead on their kitchen floor with three bullet wounds to his body. Roberts also informed the police that Fingerhut's car had been stolen from their garage.
 {¶ 5} During the ensuing investigation, Roberts gave the police her consent to search the home she had shared with Fingerhut. As part of this search, the police found some of the letters appellant had sent to Roberts from the state prison. At a subsequent point of the investigation, the police not only found some of Roberts' letters to appellant, but also learned that she had placed a number of telephone calls to him at the prison in the weeks immediately prior to his release. In addition, it was discovered that, on the evening of the murder, Roberts had rented a motel room in which the police later found blood and bandages.
 {¶ 6} In reviewing the letters between Roberts and appellant, the police noticed that he had requested that she purchase a specific type of glove to use in committing the murder. When the police subsequently found appellant in a home in Youngstown, Ohio, he had in his possession a set of gloves which were similar to the gloves described in the letter. Besides having gun residue and blood on it, one of the gloves found on appellant had a hole on the index finger which was consistent with an injury appellant had. Moreover, when the police located Fingerhut's vehicle also in Youngstown, they found bloodstains which matched the DNA profile of appellant.
 {¶ 7} Following his arrest, appellant admitted to the police that he had shot Fingerhut, but asserted that he had acted in self-defense. Under appellant's version of the events, the two men had met when appellant had asked Fingerhut for a job at his business in Youngstown. After appellant had helped Fingerhut purchase certain illicit drugs, Fingerhut drove the men back to Fingerhut's home. While at the home, the men started to argue and Fingerhut allegedly drew a gun on appellant. Appellant claimed he was eventually able to take the gun from Fingerhut, but the gun went off several times and injured both of them. After the incident, appellant took Fingerhut's car to escape, and then discarded both the gun and the car in Youngstown.
 {¶ 8} At the subsequent trial, the state presented evidence which tended to refute the version of events provided by appellant. For example, the state's evidence indicated in part that no one had seen appellant at Fingerhut's place of business on the evening of the murder. There was evidence that Roberts and appellant had planned for appellant to already be inside the home before Fingerhut arrived from work. The state's evidence also tended to establish that Fingerhut had suffered certain defensive wounds, that one of the bullets fired at him had hit him in the back, and that the "fatal" bullet had been fired through the top of his skull from a short distance. In addition, the state demonstrated that Fingerhut's life was insured under two policies which would have paid death benefits to Roberts in the sum of $550,000.
 {¶ 9} As was noted above, the jury accepted the state's evidence and found appellant guilty of the murder and the two underlying offenses. The state then dismissed one of the two aggravated murder charges, and a one-day mitigation hearing was conducted in November 2002. During this separate proceeding, appellant's trial counsel presented the testimony of one expert witness and five lay witnesses. This evidence was intended to show that appellant had certain antisocial tendencies due to a lack of a father figure during his childhood; that he had attention deficit disorder; and, that he had been infatuated with Roberts. Notwithstanding this evidence, the jury found that the aggravating circumstances of the case outweighed the mitigating facts, and therefore recommended that the death penalty be imposed.
 {¶ 10} After independently weighing the aggravating circumstances and the mitigating facts, the trial court also held that the imposition of the death penalty was appropriate in the instant case. In addition, the trial court imposed separate sentences on the charges of aggravated burglary, aggravated robbery, and the merged firearm specifications. In January 2003, appellant then filed a direct appeal from his conviction and sentence to the Supreme Court of Ohio. Upon full consideration of the matter, the Supreme Court upheld appellant's basic conviction and the imposition of the death penalty. See State v. Jackson,107 Ohio St.3d 300, 2006-Ohio-1.
 {¶ 11} Approximately one year after taking his direct appeal, appellant filed his original petition for postconviction relief under R.C. 2953.21. Nearly ninety days later, appellant then submitted an amended petition for such relief. Under the new petition, he asserted fifteen separate claims for relief. Under the majority of these claims, appellant argued that he had been denied effective assistance of trial counsel during the penalty phase of his trial. For example, he contended under one claim that the performance of his trial counsel had been deficient because they had not obtained the services of a specialist in mitigation. Four of appellant's remaining claims raised issues of possible discrimination in the manner in which the grand jury proceedings and the petit trial had been conducted. Finally, appellant also challenged the constitutionality of Ohio's execution procedure and the statutory procedure for postconviction relief. In support of his various claims, he submitted two volumes of exhibits.
 {¶ 12} In responding to the two petitions, the state moved the trial court to dismiss each of the claims without a hearing on the basis that appellant had not made a prima facie showing that his constitutional rights had been violated during his trial. In June 2004, the trial court rendered a thirty-three page judgment in which it dismissed each of the claims raised by appellant. As to all of the claims in both petitions, the trial court held that appellant had failed to establish substantive grounds to warrant any postconviction relief. The trial court further held that many of the claims were barred under res judicata because the issues either were, or could have been, raised in his direct appeal from his conviction.
 {¶ 13} In now appealing from the instant judgment, appellant has assigned the following as error:
 {¶ 14} "[1] The trial court erred when it denied [appellant's] postconviction petition without first affording him the opportunity to conduct discovery.
 {¶ 15} "[2] The trial court erred when it refused to grant [appellant] funds to employ experts.
 {¶ 16} "[3] The postconviction assistant prosecutor erred by not providing [appellant] with the information contained in the prosecutor's files which was necessary to support the claims contained in the amended petition.
 {¶ 17} "[4] The postconviction trial judge erred by not recusing himself.
 {¶ 18} "[5] The trial court erred by applying the doctrine of res judicata to bar certain of [appellant's] causes of action.
 {¶ 19} "[6] The trial court erred in dismissing [appellant's] amended postconviction petition where he presented sufficient operative facts to merit relief or, at a minimum, an evidentiary hearing."
 {¶ 20} As part of his postconviction petitions, appellant made several requests that he be allowed to conduct discovery before a final decision was made on the matter. In its final judgment on both petitions, the trial court overruled each of the requests. Under his first assignment, appellant contends that it was improper to consider the final merits of his petitions until he had had a full opportunity to conduct discovery on the issues he had raised.
 {¶ 21} In interpreting R.C. 2953.21 et seq., the provisions which govern postconviction relief in this state, the Supreme Court of Ohio has stated that there is no specific requirement that civil discovery must be afforded to the defendant in this type of proceeding. State ex rel. Love v. Cuyahoga Cty.Prosecutor's Office (1999), 87 Ohio St.3d 158. As a result, the decision to grant discovery in a given situation lies within the sound discretion of the trial judge. State v. Davie, 11th Dist. No. 2000-T-0104, 2001-Ohio-8813. Furthermore, it has been expressly held that if the trial court concludes that the petitioner has failed to state substantive grounds to warrant an evidentiary hearing on a petition, that court does not abuse its discretion in overruling a request for discovery. State v.Samatar, 10th Dist. No. 03AP-1057, 2004-Ohio-2641.
 {¶ 22} As will be discussed below, this court holds that the trial court in the instant case did not err in concluding that none of appellant's claims for relief were sufficient to state substantive grounds for reversing his conviction. Under such circumstances, it follows that the trial court did not abuse its discretion in denying any civil discovery to appellant. Thus, the first assignment in this appeal lacks merit.
 {¶ 23} In conjunction with his requests for discovery, appellant also moved the trial court for the appointment of unspecified experts to assist in preparing additional materials in support of his two petitions. Similar to the analysis it employed regarding the discovery matters, the trial court overruled this separate motion on the grounds that no experts were needed because appellant had failed to satisfy his initial burden in submitting his petitions. Under his second assignment, appellant asserts that the trial court's analysis on this question was also flawed.
 {¶ 24} Like the discovery issue, this court has already addressed the question of the appointment of an expert in a postconviction proceeding. In State v. Williams (Oct. 16, 1998), 11th Dist. No. 97-T-0153, 1998 Ohio App. LEXIS 4884, we began our discussion by stating that the right to an expert was tied to the constitutional right to counsel. The Williams court further noted that, under the relevant Ohio Supreme Court precedent, a criminal defendant's constitutional right to counsel did not extend to a proceeding under R.C. 2953.21 because a postconviction proceeding was civil in nature. Based upon this precedent, the Williams court ultimately held that the same logic would apply to experts; i.e., since a proceeding under R.C.2953.21 is considered civil, there is no constitutional right to expert assistance.
 {¶ 25} In applying the Williams logic in subsequent cases, this court has also held that if a postconviction petitioner does not initially demonstrate substantial grounds to support an evidentiary hearing on a petition, he is not entitled to the appointment of any experts. State v. Getsy (Oct. 22, 1999), 11th Dist. No. 98-T-0140, 1999 Ohio App. LEXIS 4975
 {¶ 26} In essentially arguing that the foregoing analysis is flawed, appellant states that the Williams opinion did not acknowledge the fact that R.C. 2953.21 contains a specific provision regarding the appointment of counsel. That is, subsection (I) of the statute provides that an indigent defendant who has been given the death penalty has a statutory right to have counsel appointed for the purpose of filing a petition for postconviction relief in his behalf. In light of this, appellant asserts that the basic underlying premise for the Williams
analysis as to the appointment of experts was simply incorrect.
 {¶ 27} However, in adopting the same general logic which we followed in Williams and Getsy, other courts have concluded that the existence of a statutory right to counsel is not the same as a constitutional right to counsel; hence, these courts have held that the provisions of R.C. 2953.21(I) has no effect upon the validity of their logic as to whether there is a constitutional right to an appointed expert. For example, inState v. Monroe, 10th Dist. No. 04AP-658, 2005-Ohio-5242, the court first noted that, although R.C. 2953.21(I) provided for the appointment of counsel in a postconviction proceeding, it did not have any provision for the appointment of experts. Upon then referring again to the Ohio Supreme Court precedent as to the lack of a constitutional right to counsel, the Monroe court stated that it would not recognize a constitutional right to an appointed expert based entirely upon a statutory right to counsel: "There is no authority holding that a corresponding constitutional right would exist to provide appointment of an expert * * * predicated upon the specific statutory entitlement to counsel in a proceeding in which a constitutional right to counsel would not attach." Monroe, at ¶ 15. Pursuant to this analysis, appellant has failed to establish any flaw in ourWilliams holding.
 {¶ 28} This court has recently recognized an exception to theWilliams logic when the petitioner has asserted a question as to whether he is mentally retarded. See State v. Lorraine, 11th Dist. No. 2003-T-0159, 2005-Ohio-2529. However, although this court held that an expert should be appointed for purposes of the "mental retardation" issue prior to any determination on the final merits of the petition, there was no indication inLorraine that the court intended to invalidate the general holding of Williams.
 {¶ 29} In contesting the trial court's denial of his request for experts in the instant case, appellant has not specifically raised the "mental retardation" issue in the context of this assignment.[1] Furthermore, this court would reiterate that, except for his request for a psychologist, appellant's expert requests before the trial court were framed in general terms. Accordingly, because we conclude that appellant's petitions failed to state any substantial grounds warranting an evidentiary hearing, the trial court did not err in this instance in denying the motion for the appointment of experts. Under this analysis, the second assignment does not have merit.
 {¶ 30} Appellant's next assignment also challenges the procedure which was followed by the trial court prior to the granting of the motion to dismiss. As part of his original and amended petitions, appellant asked that the state be required to give him access to two documents which were allegedly contained in the prosecutor's file. Appellant stated that the documents would assist him in supporting two of his claims for relief. Under his third assignment, he essentially contends that the trial court erred in not compelling the state to release the documents in question.
 {¶ 31} As to this point, this court would first note that the Supreme Court of Ohio has held that the prosecution's duty to provide discovery under Crim.R. 16 does not extend beyond the conclusion of the criminal trial. Love, supra. Furthermore, it has been held that a criminal defendant cannot employ R.C. 149.43
to gain access to the prosecutor's file when discovery under Crim.R. 16 is not permissible. State v. Twyford, 7th Dist. No. 98-JE-56, 2001-Ohio-3241. Accordingly, because appellant was not entitled to access the state's documents as part of the postconviction proceedings, the state could not be compelled to release any documents in this instance. For this reason, appellant's third assignment of error is not well-taken.
 {¶ 32} In his fourth assignment, appellant submits that certain aspects of the trial court's judgment on his postconviction petitions should be reversed because the court erred in considering improper information. Specifically, appellant asserts that the trial court incorrectly relied upon its own personal knowledge of certain "facts" in disposing of some of his claims for relief. Based on this, he argues that the trial judge should have recused himself so that the issues in question could be reviewed by an unbiased judge.
 {¶ 33} In raising the foregoing issue, appellant refers to two general instances in which the trial judge cited his personal knowledge in explaining his reasoning for rejecting a claim. The first instance occurred when the trial judge was reviewing appellant's contention that, at the outset of the guilt phase of the underlying trial, he had given the trial judge a letter in which he stated that he was not satisfied with the performance of his trial counsel. In ruling upon this contention, the trial judge first stated in his final judgment that he could not recall receiving this letter. Even so, the trial judge concluded that appellant had not shown that he had been unable to communicate with his counsel, since the trial judge could recall specific instances during the trial in which he had observed appellant conversing with his counsel.
 {¶ 34} As to this point, this court would indicate that the information to which the trial judge referred in his judgment was predicated on observations he had made during the course of appellant's trial. In considering the effect of a trial judge's knowledge of prior proceedings in a case, the courts of this state have held that such knowledge does not warrant the judge's recusal from further proceedings in the same matter:
 {¶ 35} "A judge need not recuse himself on the basis that he acquired knowledge of the facts during a prior proceeding. Statev. D'Ambrosio (1993), 67 Ohio St.3d 185, 188 * * *. What a judge learns in his judicial capacity, whether from pretrial proceedings, co-defendant pleas, or evidence presented in a prior case, is properly considered as judicial observations and creates no bias requiring recusal. Id. In this case, the mere fact that the same trial judge presided over separate proceedings involving both appellant and a co-defendant does not require the judge to disqualify himself." In re: Daniel E. (1997),122 Ohio App.3d 139, 140-141.
 {¶ 36} Of course, the issue of whether a judge should recuse himself is separate from the question of the extent to which he can rely upon his prior knowledge in making a judicial determination. If the prior knowledge stems from a distinct legal proceeding, the judge cannot rely upon it at all. This court has consistently held that a trial judge cannot take judicial notice of events in other legal cases, even if the prior cases involved the same parties. See Frinkley v. Meeker, 11th Dist No. 2004-P-0022, 2004-Ohio-6696; State v. Raymundo (Aug. 18, 1995), 11th Dist. No. 94-T-5025, 1995 Ohio App. LEXIS 3395. However, the foregoing basic rule does not apply to prior events within the same action; i.e., a trial judge can take judicial notice of prior matters before him in the same case. In re: Veverka
(Sept. 30, 1999), 11th Dist. No. 98-A-0053, 1999 Ohio App. LEXIS 4654.
 {¶ 37} In the instant case, the trial judge indicated in the appealed judgment that, during trial, he had observed appellant interacting with his trial attorneys. The trial judge further stated in the judgment that the transcript of the trial contained specific references to communications between appellant and his counsel. By citing to the transcript in support of his observations, the trial judge was implicitly taking judicial notice of a proceeding before him in the same case. Under the foregoing precedent, the trial judge's reliance upon the trial transcript was permissible under the Ohio Rules of Evidence.
 {¶ 38} If the trial judge's reference to his observations had not been supported by citations to the trial transcript, the outcome of our analysis on this point may have been different. Unless a judge's observations are either stated upon the record or verified by the record, a party simply has no means of challenging the veracity of those observations. Therefore, as to facts which are not of record, the better procedure may have been to have held a hearing to allow appellant to object to any such "off record" judicial notice. In the absence of such a hearing, it can be argued that a party may be denied due process unless he is allowed to question the judge as to the accuracy of the observations. But cf., State v. Morrow (Aug. 8, 1987), 2d Dist. Nos. CA 9420 and CA 9447, 1987 Ohio App. LEXIS 8195, in which it was held that the trial court had not abused its discretion in predicating the denial of a claim of ineffective assistance upon its general observation of counsel at trial.
 {¶ 39} Nevertheless, because the trial judge in this particular instance also referred to the trial record in support of his factual finding, it is unnecessary to resolve the foregoing point for purposes of this analysis. As an additional point, we would further note that appellant has not challenged the accuracy of the references to the record, or the accuracy of the record itself.
 {¶ 40} In regard to the "letter" issue, appellant further asserts that he was entitled to question the trial judge as to the statement in the appealed judgment that he, the judge, had no independent recollection of seeing the letter. As to this point, this court would simply note that the trial judge did not deny appellant's claim of ineffective assistance on the grounds that the letter did not exist and that it had been fabricated by appellant. Instead, the trial court assumed in its analysis that the letter was authentic and addressed the merits of appellant's underlying claim for relief. To this extent, appellant's inability to challenge the trial judge's lack of recall had no effect on the ultimate resolution of that particular claim.
 {¶ 41} As an aside, this court would also emphasize that a copy of the disputed letter was submitted in support of appellant's postconviction claim that he had been denied effective assistance of trial counsel. In rejecting this claim, the trial court did not base its decision solely on the fact that appellant had communicated with his two attorneys during the trial. As a separate grounds for the decision, the trial court also concluded that the assertions in the letter were insufficient to establish that there had been a total "breakdown" of the attorney-client relationship between appellant and counsel. Upon reviewing the disputed letter and the relevant case law, we can find no error in the trial court's separate holding.
 {¶ 42} Reviewing the assertions of the letter itself, it was essentially a request for the substitution of counsel. As the primary basis for this request, appellant stated that his present counsel was not representing him in the manner he would prefer. Specifically, appellant stated that, even though he had repeatedly asked one of his attorneys to let him listen to certain tape recordings, the attorney had refused to bring the tapes to his jail cell. In addition, appellant asserted in the letter that he had a verbal argument with one of the attorneys after he had questioned whether the attorney had been devoting enough time to his case.
 {¶ 43} As a general proposition, an indigent criminal defendant does not have a constitutional right to choose the attorney who will represent him at the expense of the state; rather, he is only entitled to competent legal representation.State v. Horn, 6th Dist. No. OT-03-016, 2005-Ohio-5257, at ¶ 11. As a result, the request of a defendant to discharge his court-appointed counsel will be granted only if he can "show a breakdown in the attorney-client relationship of such a magnitude as to jeopardize the defendant's right to effective assistance of counsel." State v. Coleman (1988), 37 Ohio St.3d 286, paragraph four of the syllabus. See, also, State v. Henness (1997),79 Ohio St.3d 53, 65.
 {¶ 44} In applying the foregoing basic standard, the courts of this state have recognized three examples of good cause which would warrant the discharge of court-appointed counsel: (1) a conflict of interest; (2) a complete breakdown of communication; and (3) an irreconcilable conflict which could cause an apparent unjust result. Horn, 2005-Ohio-5257, at ¶ 11, quoting State v.Blankenship (1995), 102 Ohio App.3d 534, 558. In light of the nature of the three examples, it has been further held that the substitution of counsel should be allowed only if extreme circumstances exist. State v. Glasure (1999),132 Ohio App.3d 227, 239.
 {¶ 45} In regard to a possible breakdown of the attorney-client relationship due to a lack of communication, the Supreme Court of Ohio has expressly said that the Sixth Amendment right to counsel was not intended to guarantee that a criminal defendant will have a "rapport" with his attorney. Henness,79 Ohio St.3d at 65, citing Morris v. Slappy (1983), 461 U.S. 1. Accordingly, the existence of hostility or a personal conflict between the attorney and the defendant does not constitute a total breakdown so long as it does not inhibit the attorney from both preparing and presenting a competent defense. State v.Meridy, 12th Dist. No. CA2003-11-091, 2005-Ohio-241; State v.Mayes, 4th Dist. No. 03CA9, 2004-Ohio-2027. Moreover, the lack of communication must be permanent in nature before a finding of a complete breakdown can be made. State v. Evans,153 Ohio App.3d 226, 2003-Ohio-3475, at ¶ 32. Finally, a dispute over the trial tactics or strategy of the attorney is not sufficient to establish the requisite breakdown. Id.
 {¶ 46} In the instant case, our review of the alleged letter indicates that appellant did not state in his letter why he thought the unspecified tape recordings were relevant to his case; thus, the reference in the letter to the attorney's failure to provide the tapes only showed a possible disagreement as to the manner in which the tapes could be used at trial. Moreover, although the letter does state that appellant had an argument with one of his attorneys, it does not allege that, due to the argument, there was a total breakdown of communication with that attorney during the trial.
 {¶ 47} Therefore, as the trial court correctly noted in the appealed judgment, the assertions in appellant's letter only established that he was not entirely satisfied with the nature of the representation he was receiving from his court-appointed counsel. This dissatisfaction was not sufficient to show a complete breakdown of the attorney-client relationship which would have warranted the granting of appellant's request for substitution of counsel. Based upon this, this court holds that, even if the trial court did err in referring to its own personal observations of the relationship between appellant and his two attorneys, its determination on the "ineffective assistance" claim could have been predicated solely upon the trial court's holding that appellant's letter did not raise any substantive issue on that point.
 {¶ 48} As was noted above, appellant has asserted under this assignment that there was a second basic instance in which the trial court improperly relied upon its own personal observations. The second instance cited by appellant pertains to the trial court's disposition of his "racial discrimination" claims. For example, in ruling upon the claim that discrimination occurred in regard to the appointment of the foreperson for the grand jury proceedings, the trial court specifically referred to his knowledge of the procedure used by the Trumbull County Court of Common Pleas in appointing the foreperson.
 {¶ 49} In regard to this specific point, this court would agree that the trial judge's reliance upon his own personal knowledge was improper in this instance. First, we would note that any proceeding before the grand jury would be distinct from the petit trial for appellant, and the trial judge is not permitted to take judicial notice of any action separate from the proceeding before him. Second, we would indicate that the trial judge's own knowledge of Trumbull County Grand Jury proceedings in general could not encompass all possible information on that topic. Under such circumstances, the trial judge's knowledge could not be dispositive because there may be instances beyond his knowledge in which discrimination did occur.
 {¶ 50} Nevertheless, this court would further note that the trial court's dismissal of the "racial discrimination" claims was based upon either that: (1) the claims were barred by res judicata; or (2) appellant's evidentiary materials were insufficient to raise a prima facie showing of discrimination. As will be discussed under the fifth and sixth assignments of this appeal, we conclude that this aspect of the trial court's decision must be upheld. Therefore, the trial court's reliance on his personal knowledge was harmless as to these particular claims,
 {¶ 51} Finally, as a separate part of this assignment, appellant contends that, in ruling upon some of his claims for relief, the trial judge improperly relied on his own personal opinion. For example, in dismissing one of the claims in which it was alleged that appellant had been denied effective assistance of counsel, the trial judge stated in his final judgment that the presentation of the testimony of appellant's family members during the mitigation phase should not have required "exhaustive preparation" on the part of trial counsel. Appellant now asserts that the judge's statement constituted an "opinion" which should have been subject to cross-examination by his postconviction counsel.
 {¶ 52} When viewed in the context of the appealed judgment, it is apparent that the statements in question were only intended to set forth the trial judge's legal analysis concerning whether the actions of counsel could be deemed ineffective as a matter of law. To this extent, the trial judge's statements merely constituted his conclusions of law on the various points. Although such conclusions can be challenged on appeal and must be reviewed under a de novo standard, they are not in any respect evidential submissions to which the right to cross-examination would apply.
 {¶ 53} Pursuant to the foregoing analysis, this court holds that appellant has failed to show that he was prejudiced by the trial judge's references to his personal knowledge. Accordingly, the fourth assignment in this appeal is also without merit.
 {¶ 54} In the fifth assignment of error, appellant submits that the trial court erred by applying the doctrine of res judicata to bar certain causes of action that he raised in his postconviction relief petition. After reviewing this "res judicata" aspect of the trial court's decision, this court concludes that portions of this analysis were flawed. However, in every instance in which res judicata was incorrectly applied, the trial court correctly found that appellant had failed to set forth substantial grounds in support of the respective claims for relief.
 {¶ 55} It is well-established that the doctrine of res judicata is applicable to postconviction relief proceedings. InState v. Perry (1967), 10 Ohio St.2d 175, the Supreme Court of Ohio held:
 {¶ 56} "Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except on appeal from that judgment, any defense or claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in the judgment of conviction or on appeal from that judgment." Id. at 180.
 {¶ 57} Additionally, in State v. Cole (1982),2 Ohio St.3d 112, the Supreme Court of Ohio specifically indicated that res judicata is a proper basis to dismiss a postconviction relief petition where the issue sought to be presented could have been raised at trial or in a direct appeal, and where "such issue could fairly have been determined without resort to evidencedehors the record." Id. at paragraph one of the syllabus.
 {¶ 58} In State v. Jones (Dec. 29, 2000), 1st Dist. No. C-990813, 2000 Ohio App. LEXIS 6197, the court held "[t]o overcome the res judicata bar, a petitioner must provide cogent evidence outside the record. This means that the evidence supporting a claim must be competent, relevant and material, must be more than marginally significant, and must `advance the claim "beyond mere hypothesis and a desire for further discovery."' * * * It `must be more than evidence which was in existence and available to the defendant at the time of trial and which could and should have been submitted at trial if the defendant wished to make use of it.'" Id. at 4-5, quoting State v. Fears (Nov. 12, 1999), 1st Dist. No. C-990050, 1999 Ohio App. LEXIS 5365, andState v. Coleman (Mar. 17, 1993), 1st Dist. No. C-900811, 1993 Ohio App. LEXIS 1485.
 {¶ 59} Eight of appellant's claims were dismissed by the trial court based, in part, upon res judicata. They will be individually addressed in the order they have been raised in appellant's brief.
 {¶ 60} In the first claim under the fifth assignment of error, appellant made the argument that the state of Ohio has an infirm postconviction relief system. It is clear, however, that Ohio's postconviction relief system has been in place prior to appellant's trial and, therefore, could have theoretically been raised in a direct appeal. Thus, the trial court properly denied the claim based upon res judicata.
 {¶ 61} Moreover, this court has previously held that the proper forum to raise such a challenge to the postconviction relief system in Ohio would be in a habeas corpus action. Statev. Wiles (1998), 126 Ohio App.3d 71, 83.
 {¶ 62} The second claim made by appellant is that the Trumbull County Prosecutor seeks the death penalty in a racially discriminatory manner.
 {¶ 63} We must agree with appellant that it would be extremely difficult, if not impossible, to raise this issue at trial. Instead, it is most appropriate to raise this issue in postconviction relief proceedings, when evidence to support such a claim would be outside the record. However, now that appellant has the opportunity to do so, he has failed to present any specific evidence of discriminatory intent against him. Thus, he has failed to support this claim beyond mere speculation.
 {¶ 64} Appellant does argue that his trial counsel was ineffective by not raising this issue at trial, but that is a separate argument which will be addressed later.
 {¶ 65} The third claim made by appellant is that the Trumbull County Grand Jury that indicted him contained an underrepresentation of African-Americans.
 {¶ 66} First, appellant made no effort to challenge the indictment prior to trial. Second, as pointed out by the trial court, appellant failed to present any evidence whatsoever as to the racial composition of the grand jury that indicted him. Additionally, even if appellant could establish that the grand jury that indicted him was proportionately underrepresented as to African-Americans, he would have to establish that "an intentional and systematic exclusion of blacks had occurred."State v. Hill (June 22, 1990), 4th Dist. No. 1619, 1990 Ohio App. LEXIS 2509, at 5. Appellant presented no evidence of an intentional exclusion of African-Americans from the grand jury that indicted him. Accordingly, the trial court properly rejected this claim.
 {¶ 67} In the fourth claim made by appellant, he asserts that the Trumbull County Court of Common Pleas selected a grand jury foreperson in a racially discriminatory manner.
 {¶ 68} Evidence as to the manner by which the grand jury foreperson was chosen could have been sought prior to appellant's actual trial. Moreover, in State v. Hughbanks, 1st Dist. No. C-010372, 2003-Ohio-187, the court held that "[i]f a grand-jury foreperson is selected from within the ranks of a properly constituted grand jury, and the foreperson's role is essentially ministerial, purposeful discrimination in the selection of a grand-jury foreperson will not provide a basis for reversing a conviction." Id. at ¶ 35. We agree with that reasoning.
 {¶ 69} The fifth claim made by appellant is that the petit jury venire was selected in a racially discriminatory manner.
 {¶ 70} At the outset of our analysis, this court would note that, during the jury selection process, appellant's trial counsel stated on the record that there was an absence of African-Americans on the jury. That fact was then acknowledged by the trial court. Realistically, the simple unexplained absence of African-Americans from the jury venire would be insufficient support for a successful appeal. As a result, additional evidence would have been needed in order to establish discrimination in the selection of the petit jury venire.
 {¶ 71} In attempting to provide such additional evidence as part of his petition for postconviction relief, appellant presented six new exhibits. The first exhibit was a summary of certain census data concerning the demographics of Trumbull County in the year 2000. This exhibit indicated that African-Americans composed approximately eight percent of the population of Trumbull County at that time. The next three exhibits consisted of copies of newspaper articles from February 1992. Each of these articles stated that the jury pool for a prior death-penalty case in Trumbull County had not contained any African-Americans. The fifth exhibit was a copy of an affidavit which an expert witness had submitted as part of a federal habeas corpus action regarding the validity of that 1992 Trumbull County death-penalty case. In that affidavit, the expert had concluded that the underrepresentation of African-Americans in the jury pool could not have been the result of a random occurrence. Finally, the sixth exhibit was the affidavit of an attorney who had attended the separate trial of Donna Roberts. In this document, the attorney merely stated that the twelve-person jury in the Roberts case had been composed solely of Caucasians.
 {¶ 72} Our review of the foregoing documents shows that the information in five of the six exhibits had already been in existence at the time of appellant's trial in November 2002; accordingly, these exhibits could have been presented to the trial court as part of a properly-raised argument during the trial. In considering postconviction claims of discrimination in the selection of the petit jury venire, the First Appellate District has held that such claims are barred under the doctrine of res judicata when they are predicated upon evidence which already existed at the time of the trial. State v. Leonard,157 Ohio App.3d 653, 2004-Ohio-3323. The underlying logic of this holding is that a defendant cannot use a postconviction proceeding to retry his case with evidence which could have been submitted during the actual trial. See State v. Coleman (Mar. 17, 1993), 1st Dist. No. C-900811, 1993 Ohio App. LEXIS 1485.
 {¶ 73} In the instant case, the sole exhibit which was created after the end of appellant's trial was the affidavit of the attorney who had attended the trial of Donna Roberts. In that affidavit, the attorney stated only that the twelve-person jury in the Roberts case had not contained any African-Americans; the affidavit did not address the issue of the composition of the entire petit jury venire. Thus, the attorney's affidavit did not set forth any substantive evidence concerning the "petit jury venire" question. In light of these circumstances, this court holds that the trial court did not err in applying res judicata to the "petit jury venire" claim because appellant's substantive evidence consisted of five exhibits which could have been presented to the trial court during the trial itself.
 {¶ 74} The sixth claim presented by appellant is that he did not receive effective assistance of counsel during the trial phase. Although appellant asserted a number of arguments before the trial court in support of his basic contention that he had been denied effective assistance, his "res judicata" assertion focuses upon that aspect of his argument in which he alleged that his trial counsel had failed to pursue the question of the specific role Donna Roberts had played in the murder. Specifically, he asserts that the trial court erred in applying the doctrine of res judicata to this particular point because, as part of his postconviction petition, he presented thirteen new exhibits which were never submitted at trial.
 {¶ 75} To the extent that the new exhibits would not have been included in the record in his appeal to the Supreme Court of Ohio, this court would agree that the fact that appellant had raised an "ineffective assistance" assignment before the Supreme Court did not bar a separate argument on this point in his postconviction petition. Even if trial counsel had been aware of these exhibits and simply chose not to submit them, it still would be impossible for the Supreme Court to make a proper decision on the merits of appellant's contention because it would not have the opportunity to review the exhibits. Under these circumstances, the exhibits in question had to be considered "new" evidence.
 {¶ 76} As a result, since the only proper means for appellant to present the exhibits would be through a postconviction petition, the trial court did err in applying res judicata in this particular instance. However, as will be discussed under the sixth assignment of this appeal, the trial court did not err in also concluding that the exhibits in question were insufficient to demonstrate any ineffective assistance on the part of trial counsel.
 {¶ 77} The seventh claim made by appellant is that he did not receive effective assistance of counsel during the mitigation phase.
 {¶ 78} Appellant correctly points out that a claim of ineffective assistance of counsel in the mitigation phase that is dependant upon the affidavits of individuals who would have provided additional testimony is not subject to the bar of res judicata. State v. Keith, 79 Ohio St.3d 514, 536, 1997-Ohio-367; State v. Scott (1989), 63 Ohio App.3d 304, 308. Clearly, that evidence was not available until after the mitigation portion of the trial.
 {¶ 79} However, from a review of the judgment entry, it is apparent that the trial court rejected this claim on its merits in addition to relying on res judicata. With respect to the affidavits of appellant's friends and family who did not get to testify during the mitigation phase, the trial court stated that "[n]othing in these affidavits offer[s] (sic) mitigating factors at all, let alone enough to outweigh the aggravating circumstances."
 {¶ 80} Similarly, none of the other exhibits presented by appellant were found to be germane to the mitigation phase. Accordingly, it is clear that the trial court did not rely solely on res judicata but, instead, decided this claim was not well-taken on the merits.
 {¶ 81} The eighth claim advanced by appellant is that the state of Ohio's use of lethal injection is constitutionally infirm.
 {¶ 82} In support, he presented the affidavit of Dr. Mary J.S. Heath. However, the substance of this affidavit does not change the clear holding of the Supreme Court of Ohio that Ohio's use of lethal injection is constitutional. State v. Carter,89 Ohio St.3d 593, 608, 2000-Ohio-172.
 {¶ 83} Based upon the foregoing analysis, we hold that, even when the trial court's analysis concerning the application of res judicata was flawed, the error was not prejudicial to appellant. Thus, his fifth assignment of error is without merit.
 {¶ 84} In the sixth assignment of error, appellant contends that the trial court erred in dismissing his postconviction relief petition without a hearing.
 {¶ 85} It is well-established that a petitioner is not automatically entitled to a hearing. Before a hearing will be granted, a petitioner must establish that there are substantive grounds for relief. R.C. 2953.21(C); State v. Calhoun,86 Ohio St.3d 279, 282-283, 1999-Ohio-102.
 {¶ 86} In the present case, appellant asserts that his causes of action were supported by sufficient operative facts to establish substantive grounds for relief. Appellant set forth fifteen causes of action and they will be addressed in seriatim.
 {¶ 87} In the first claim in this assignment raised by appellant, he contends that the Trumbull County Prosecutor has made decisions regarding who should be charged with the death penalty in a racially discriminatory manner.
 {¶ 88} However, appellant failed to provide any evidence whatsoever that the charges against him were racially motivated. Appellant claims that his Caucasian co-defendant was offered a better plea bargain, but he fails to provide any support for this claim, beyond the bare assertion itself. Further, he fails to note that his co-defendant did not commit the actual killing; thus, their circumstances were arguably different.
 {¶ 89} Due to a lack of supporting evidence for his assertion, the trial court properly denied this claim.
 {¶ 90} In the second cause of action, appellant submits that the grand jury that indicted him was drawn from a venire that lacked sufficient representation of African-Americans.
 {¶ 91} Yet, appellant failed to provide the trial court with any evidence of the racial composition of the actual grand jury that indicted him, or the venire from which the grand jury was selected. In short, while appellant filed numerous exhibits with his postconviction relief petition, none of them concerned, either directly or indirectly, the grand jury composition in the present case.
 {¶ 92} Moreover, as the trial court noted, the Supreme Court of Ohio has held that "not every grand jury has to represent a `fair cross section,' so long as the selection process is nondiscriminatory." State v. Williams (1997), 79 Ohio St.3d 1,17. More recently, the Supreme Court of Ohio ruled that the use of voter registration roles as a source for grand jurors does not intentionally exclude any specific racial group, and is an acceptable method of selecting jury venires. State v. Nields
(2001), 93 Ohio St.3d 6, 19.
 {¶ 93} In the third cause of action, appellant contends that it is the good faith belief of his counsel that the Trumbull County Court of Common Pleas has employed a system to choose grand jury forepersons that can lead to discrimination in the selection process.
 {¶ 94} While the state does not dispute the fact that the foreperson in this case was a Causacian woman, appellant provided no evidence that this woman was handpicked by a Trumbull County judge, that she was chosen because she was Causasian, or that she was responsible for indicting appellant because of his race. Moreover, with all due respect to appellant's trial counsel, personal belief is a far cry from personal knowledge. No operative facts were set forth which laid a foundation to support or put this belief beyond mere speculation. Furthermore, there is no indication that the foreperson was chosen from outside the system that was used to comprise the balance of the grand jury. Therefore, appellant cannot prevail on this claim. Hughbanks,
supra, at ¶ 35.
 {¶ 95} Thus, the trial court properly found that appellant's contention "is far too tangential to be substantive."
 {¶ 96} In the fourth cause of action, appellant contends that the prosecutors at trial failed to provide him with exculpatory evidence. Specifically, appellant alleges that certain undisclosed law enforcement agents suppressed a police report that the decedent had made plans to fake his own death. Somehow, appellant believes that such a report would have been favorable to his case.
 {¶ 97} The trial court found that, if this report actually existed, it would not have been exculpatory because appellant admitted to shooting a man in Robert Fingerhut's home whom he, himself, identified as Fingerhut. The overwhelming evidence was that the victim was Robert Fingerhut and that it was appellant who shot him.
 {¶ 98} The trial court also found that appellant supplied no credible evidence to support his claim that a police report stating that Fingerhut planned to fake his own death ever existed. On this point, appellant supplied the trial court with an unsigned, handwritten letter wherein the unknown author stated that "RSF" had an "obsession about faking his own death." There was also an affidavit from his counsel of record in this case stating that trial counsel for co-defendant, Roberts, also told him about this alleged police report. However, there was no affidavit from Roberts' trial counsel. Again, we note that appellant admitted to shooting Fingerhut, albeit in self-defense. Thus, the exculpatory value of any such report is non-existent. There may be a dispute of fact about its existence, but it is not a material or relevant dispute of fact as is required.
 {¶ 99} The trial court did not err by dismissing this cause of action.
 {¶ 100} In the fifth cause of action, appellant maintains that the trial court failed to hold a hearing concerning his request to discharge his trial counsel. His allegation is that he sent a letter to the trial court judge prior to trial in which he complained that one of his trial attorneys was not paying enough attention to him.
 {¶ 101} Assuming that he sent such a letter, there is no allegation that appellant could not communicate with this attorney or that communication had irretrievably broken down. He made no claim that he was somehow denied his constitutional right to counsel in this case. In short, there was no claim of prejudice. It is almost axiomatic that every defendant feels his or her attorney is not paying enough personal attention to the case. That is not per se indicative that the attorney is professionally deficient. Additionally, it is well-established that a petitioner's own self-serving statement does not compel a hearing. State v. Kapper (1983), 5 Ohio St.3d 36, 37-38. Thus, without more, the trial court properly denied this cause of action.
 {¶ 102} In the sixth cause of action, appellant asserts that trial counsel failed to retain a competent mitigation specialist and, as a result, the mitigation investigation was incomplete.
 {¶ 103} From the record, it is clear that Dr. Sandra McPherson was hired as appellant's expert witness. It is also clear that Dr. McPherson has filled a similar role in at least five prior capital murder cases. Thus, appellant's claim that Dr. McPherson was less than competent was an unsupported allegation. As an expert psychological witness, Dr. McPherson testified very capably. There is nothing to indicate she was intended to be the mitigation specialist. Furthermore, appellant's evidentiary materials were not sufficient to demonstrate that an actual mitigation expert would have made a difference under the facts of this case. Accordingly, appellant failed to present substantive grounds for relief as to this claim.
 {¶ 104} Under the seventh cause of action, appellant argues that the petit jury that convicted him was drawn from a venire which did not contain a sufficient number of African-Americans. In essence, he submits that the evidentiary materials which he filed with his postconviction petition were sufficient to raise a prima facie case that the exclusion of African-Americans from the jury pool was due to some form of systematic discrimination. In support of this point, appellant relies primarily upon an affidavit of a "jury" expert which was originally filed in a federal habeas corpus action involving a different individual who, in 1992, had been convicted of capital murder in Trumbull County.
 {¶ 105} As an initial matter, this court would again indicate that this specific cause of action was barred under the doctrine of res judicata. As was noted in our analysis under the fifth assignment, the doctrine was applicable to this claim because it was based upon exhibits which had been in existence at the time of his trial. Nevertheless, consistent with the approach taken by the trial court, we will also address the merits of this particular claim.
 {¶ 106} As part of the basic Sixth Amendment right to a jury trial, a criminal defendant is entitled to a petit jury which is composed of a representative cross-section of the local community. State v. Dickerson, 9th Dist. No. 22536,2005-Ohio-5499, at ¶ 7. In order to establish a prima facie violation of this constitutional requirement, the defendant must show: "(1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process."State v. Fulton (1991), 57 Ohio St.3d 120, paragraph two of the syllabus. In applying the foregoing test, this court has emphasized that all three prongs of the test must be satisfied before a prima facie showing will be found. State v. McCaleb,
11th Dist. No. 2002-L-157, 2004-Ohio-5940, at ¶ 23.
 {¶ 107} In the instant case, our review of the evidentiary materials indicates that the six exhibits submitted in regard to this claim were sufficient to establish the first two prongs of the Fulton test. As to the first prong, this court would note that the Supreme Court of Ohio has expressly stated that African-Americans are considered a "distinctive" group for purposes of this analysis. See State v. Jackson,107 Ohio St.3d 53, 2005-Ohio-5981, at ¶ 66. In relation to the second prong, appellant's exhibits demonstrated that African-Americans constituted approximately eight percent of the population of Trumbull County under the census data of the year 2000; as a result, since only two or three African-Americans were called as part of the total jury venire of one hundred forty-two persons in appellant's trial, that group was not reasonably represented in the venire. Accordingly, the key point in this analysis is whether appellant's evidentiary materials made a prima facie showing that the underrepresentation of African-Americans was due to systematic discrimination.
 {¶ 108} In attempting to satisfy the third prong of theFulton test, appellant relied primarily upon a copy of the affidavit of Diane Wiley, who is the president of the National Jury Project Midwest. The substance of Wiley's affidavit did not pertain to the composition of the jury venire in appellant's case; instead, it related to a separate capital murder case. Specifically, in 2000, Wiley had been retained by the Ohio Public Defender Office to evaluate whether the special jury venire drawn in State v. Davie, Trumbull C.P. No. 91-CR-288, had been representative of the population of African-Americans in Trumbull County at the time of the Davie trial in 1992. The Wiley affidavit had originally been submitted in a federal habeas corpus proceeding involving Roderick Davie.
 {¶ 109} In her affidavit, Wiley first concluded that, since African-Americans had constituted six percent of the population of Trumbull County as of the date of the Davie trial, that group had been underrepresented in the Davie jury venire because no African-Americans had been included in that venire. Wiley further concluded that the underrepresentation "represented" a statistically significant deviation, and that the deviation would not have occurred unless there had been some form of systematic discrimination.
 {¶ 110} Obviously, in submitting the Wiley affidavit as part of the evidentiary materials accompanying his postconviction petition, appellant was attempting to show that African-Americans had been excluded from the jury venire in a prior death-penalty case in Trumbull County. In further support of this point, appellant also submitted the affidavit of an attorney who stated that, in attending the separate trial of co-defendant Donna Roberts, he had noticed that the twelve-person jury in that case did not have any African-Americans. Therefore, when considered as a whole, appellant's exhibits indicated that there had been two death-penalty cases in Trumbull County in which African-Americans had been underrepresented in the entire jury venire, and there had been a third case in which no African-Americans had sat on the final jury.
 {¶ 111} Upon reviewing the prior precedent in this state regarding the "fair cross-section" requirement of the Sixth Amendment, this court concludes that appellant's exhibits were insufficient to make a prima facie showing of systematic exclusion of African-Americans. In State v. McNeill (1998),83 Ohio St.3d 438, the Ohio Supreme Court's analysis of the third prong of the Fulton test consisted of the following:
 {¶ 112} "Moreover, [the defendant's] systematic-exclusion claim is based solely on alleged underrepresentation on his
venire. But underrepresentation on a single venire is notsystematic exclusion. See Ford v. Seabold (C.A. 6, 1988),841 F.2d 677, 685. Cf. [Duren v. Missouri (1979), 439 U.S. 357,] at 366, * * * (discrepancy `not just occasionally, but in every weekly venire for a period of nearly a year' showed systematic exclusion)." (Emphasis sic.) Id. at 444.
 {¶ 113} In light of the reference in McNeill to the Duren
precedent, it follows that a prima facie showing of systematic exclusion must be predicated upon a continuing pattern of underrepresentation. Thus, the conclusory statement in the Wiley affidavit, based solely on her analysis of the jury venire in theDavie case, would not be sufficient to establish a continuing pattern. Similarly, in light of the fact that the trial in the instant case was held approximately ten years after the trial inDavie, it cannot be said that the underrepresentation in both cases shows a continuing pattern.
 {¶ 114} As an aside, this court would further note that the affidavit appellant submitted in regard to the Donna Roberts trial only related to the composition of the final jury; i.e., there was no statement in the affidavit as to the composition of the entire petit jury venire. To this extent, the affidavit was not relevant to the issue of possible discrimination in the selection of the jury venire. However, even if the affidavit had pertained to the entire jury venire, this still would only be sufficient to demonstrate an "occasional" discrepancy. Therefore, since appellant's evidentiary materials did not make a prima facie showing as to each prong of the Fulton test, the trial court properly rejected his assertion that his petit jury venire had not consisted of a fair cross-section of the community.
 {¶ 115} In relation to the selection and composition of the venire, appellant's brief also contains the conclusory statement that the underrepresentation of African-Americans violated his federal right to equal protection under the law. Even though appellant failed to present a complete argument as to this point, this court would note that the Supreme Court has stated that, in using statistical evidence to establish the exclusion of a "class" of people, the defendant must be able to show that the exclusion has occurred over a significant period of time.McNiell at 444. In this case, since appellant was only able to demonstrate that the underrepresentation of African-Americans on the petit jury venire only occurred twice in approximately ten years, his evidentiary materials were insufficient to meet the requirement that any exclusion had taken place over a "significant period."
 {¶ 116} For the foregoing reasons, this court holds that the trial court did not err in concluding that appellant had failed to submit sufficient evidence to support his claim of discrimination in the selection of the petit jury venire.[2]
 {¶ 117} In the eighth cause of action, appellant contends that he was denied the effective assistance of trial counsel during the pretrial stages of the proceedings.
 {¶ 118} In State v. Pierce (1998), 127 Ohio App.3d 578,586, this court explained that in asserting a claim of ineffective assistance of counsel, a petitioner must submit material containing operative facts that demonstrate both prongs of the two-part test set forth in Strickland v. Washington
(1984), 446 U.S. 668, 687. The first part is that counsel's performance was deficient, and the second part is that the deficient performance prejudiced the defense. In order to demonstrate prejudice, a petitioner needs to show a reasonable probability that, if not for counsel's errors, the result of the trial would have been different. State v. Bradley (1989),42 Ohio St. 3d 136, 143.
 {¶ 119} In the case at bar, the trial court determined that none of the exhibits attached to appellant's petition even remotely suggested that his trial counsel was ineffective.
 {¶ 120} First, appellant maintains that his counsel failed to develop any significant information concerning his co-defendant's role in the homicide. As to this point, this court would merely note that, under his ninth cause of action in this assignment, appellant has also presented an argument concerning whether he was denied effective assistance as a result of trial counsel's failure to submit evidence regarding the role of Donna Roberts in the murder. For the sake of clarity, we will consider the merits of the instant argument pertaining to her as part of our discussion under the ninth cause of action.
 {¶ 121} Second, appellant asserts that the victim, Fingerhut, was involved in illegal activities that were not brought to the attention of the jury. However, appellant failed to inform the court as to what those activities were, or, more importantly, how they had any effect on the shooting.
 {¶ 122} Next, appellant claims that his trial counsel did not delve into the "dysfunctional" relationship between Roberts and Fingerhut. Contrary to appellant's claim, the jury was aware that the couple had been divorced yet still lived together; and, during this time, Roberts was involved in a relationship with appellant. Beyond the classic triangle, appellant has failed to elucidate any other oddities of their relationship. It is worth noting once again, his defense was self-defense. Without further facts, the relevance of these allegations to appellant's self-defense theory is nonexistent.
 {¶ 123} Appellant also contends that his trial counsel at mitigation failed to fully develop the extent of his "significant mental impairment." It is clear to this court that the claim of appellant's mental impairment was questionable at best. He was tested shortly after his arrest in this case and his scores were significantly higher than when he had been tested in high school. Thus, this lack of emphasis was, arguably, a matter of trial strategy that trial counsel employed.
 {¶ 124} Next, appellant maintains that his trial counsel did not challenge the grand jury or petit jury venires, nor the grand jury foreperson, for lacking in adequate African-American representation. As to this issue, this court would again note that, as part of his postconviction petition, appellant tried to present evidence to establish that discrimination had occurred in the selection of the grand jury foreperson, the grand jury venire, and the petit jury venire. As was discussed previously under this assignment and the fifth assignment, we conclude that his evidence was not sufficient to make a prima facie showing of improper exclusion of African-Americans. In light of this, it follows that appellant's trial counsel was not ineffective by failing to assert these particular points during the trial.
 {¶ 125} Appellant next complains that his trial counsel did not attempt to suppress appellant's statement to the police on the grounds that his school records showed an I.Q. of 70 and 72 when he was 13 and 17 years old, respectively. However, as the trial court stated in its judgment, those facts would not have affected its opinion that appellant gave a voluntary and self-serving statement to the investigators.
 {¶ 126} A failure to move to suppress is not per se ineffective assistance of counsel unless there is prejudice.State v. Loza (1994), 71 Ohio St.3d 61, 83. The facts indicate that it would have been extremely unlikely that such a motion would have been granted. Even without this statement admitting the shooting, the physical evidence coupled with the numerous letters planning this murder were abundantly sufficient to convict him.
 {¶ 127} Next, appellant contends that his trial attorneys conducted an inadequate investigation into the power and control that Roberts had over him, including her manipulation of him that was possible due to her superior intellect. There is no evidence in or out of the record to suggest that appellant was a reluctant or unwilling participant, or that Roberts had a superior intellect. As previously indicated, the defense of self-defense had little relevance to appellant's relationship with Roberts. Thus, the trial court properly denied this argument.
 {¶ 128} Appellant then claims that no family members besides his mother were interviewed in preparation for the mitigation phase of the proceedings. Accordingly, he argues that Dr. McPherson's testimony was based upon an inadequate and incomplete social history.
 {¶ 129} However, appellant fails to cite any new relevant or non-cumulative information which the jury did not already hear, and which could be considered as mitigating evidence. Thus, appellant failed to meet the burden placed upon him in postconviction relief proceedings.
 {¶ 130} In the ninth cause of action, appellant submits that, as a result of the failure of his trial attorneys to present evidence to the jury concerning the role of Donna Roberts in the murder, he was denied effective assistance of counsel during both the pretrial stage of the proceeding and the "guilt" phase of the trial. Appellant contends that his attorneys should have pursued two points in regard to Roberts. First, according to appellant, his attorneys should have informed the jury that Roberts was very intelligent and had "manipulated" him into committing the murder. In support of this particular point, appellant asserts that Roberts had a history of using African-American males for her own benefit. Second, appellant states that his attorneys should have pursued the possibility that Roberts had actually been present during the commission of the murder.
 {¶ 131} In raising the foregoing two points in his petition for postconviction relief, appellant submitted thirteen new exhibits which, inter alia, included copies of nine police reports. Our review of these exhibits readily indicates that they can be divided into two basic categories. The first category consisted of documents that pertained to Roberts' tendency to have relationships with African-American males. For example, appellant presented a copy of a written statement which an African-American male, Santiago Mason, gave to police officers after Roberts had accused him of stealing certain property from her place of business. According to Mason, Roberts tried to seduce him immediately after they had met and offered to give him money so that he could have his driver's license reinstated. Mason further stated that when he later refused to have sexual relations with her, she started causing trouble for him at his place of employment.
 {¶ 132} Upon reviewing all of the documents in the first category of exhibits, this court would agree that the documents demonstrate that Roberts wanted to date African-American males in general and would provide gifts to them in order to sustain the relationship. However, there is no indication in the documents that once Roberts had developed the relationship, she would then "use" the African-American males to commit illegal acts for her. Although appellant asserts in his appellate brief that the Mason statement establishes that Roberts had attempted to persuade another African-American male to commit the murder, our review of the document simply does not support his assertion. At best, all of the exhibits only indicate that Roberts tried to treat these individuals well so that she could maintain her relationship with them.
 {¶ 133} The same basic conclusion can be drawn in regard to appellant's assertion that Roberts was a person of superior intelligence. Although there was some support in appellant's evidentiary materials that Roberts had at least moderate intelligence, there was nothing in those materials to indicate that she used this intelligence to induce other individuals of lesser intelligence to commit criminal offenses for her. To this extent, this court concludes that the first category of appellant's exhibits would not have been admissible for the purpose of establishing a pattern of manipulative behavior on the part of Roberts.
 {¶ 134} In addition, our review of the exhibits does not support the holding that the submission of evidence as to the difference between the intelligence of Roberts and appellant would have affected the outcome of the guilt phase of the trial. As to this point, we would emphasize that the state submitted evidence during the guilt phase concerning the communications between appellant and Roberts prior to his release from prison. This evidence showed, at the very least, that appellant played an equal role in the planning of the murder. Therefore, it is extremely unlikely that evidence relating to Roberts' basic intelligence would have altered the jury's conception as to the nature of the relationship between her and appellant.
 {¶ 135} Finally, and most importantly, this court would emphasize that appellant's sole defense during the guilt phase of his trial was that he had acted in self-defense in the shooting of Fingerhut. Thus, the submission of evidence as to Roberts' manipulative ability would have resulted in the presentation of contradictory theories of the case to the jury. In light of the fact that the defense of self-defense was predicated upon appellant's own confession, it cannot be said that appellant's trial attorneys rendered ineffective assistance by failing to pursue a separate legal theory for purposes of the guilt phase of the trial.
 {¶ 136} The second category of exhibits which appellant presented in regard to Roberts pertained to her possible role in the actual commission of the murder. Included in this set of exhibits was a copy of a police report which noted that Roberts had specks of a red substance on her blouse while the police were conducting their initial search of the premises. In addition, appellant submitted a copy of a report which stated that the test for gun residue on her hands immediately after the shooting had rendered inconclusive results.
 {¶ 137} In relation to these exhibits, this court would again indicate that, under appellant's version of the various events, the shooting took place during a confrontation between himself and Fingerhut. Accordingly, if trial counsel had presented evidence during the guilt phase as to the possibility that Roberts had committed the murder, this would have conflicted with appellant's primary theory that he had committed the offense in self-defense. As a result, we hold that, since appellant's evidentiary materials were insufficient to establish that his trial counsel failed to raise a viable argument concerning the role of Roberts, the trial court did not err in rejecting the ninth cause of action of his postconviction petition.
 {¶ 138} In his original petition under the tenth cause of action, appellant asserted that his trial counsels' actions during the culpability stage of the proceedings denied him his right to effective assistance of counsel. However, appellant's tenth cause of action in his amended petition raised the issue of ineffective assistance of counsel during the mitigation phase of the proceedings rather than the culpability phase. Thus, this court will address appellant's argument as amended.
 {¶ 139} This claim was addressed, for the most part, in this court's analysis of appellant's fifth assignment of error. The only new argument made is that the last minute substitution of Attorney Thomas Wright for Attorney James Lewis compromised his defense during mitigation. Specifically, appellant asserts that Attorney Wright was not certified by the Supreme Court of Ohio to serve in a capital case, and he was new to the case.
 {¶ 140} However, none of the exhibits presented by appellant in support of this claim demonstrate that Attorney Wright was ineffective. Additionally, appellant was offered a continuance by the trial court to delay proceedings until Attorney Lewis could recuperate, but the court's offer was rejected by appellant who stated that he wanted to proceed with Attorney Wright.
 {¶ 141} Thus, this claim was properly denied by the trial court.
 {¶ 142} Appellant's next argument under this assignment pertains to his cause of action regarding the performance of Dr. Sandra McPherson during the mitigation phase. Specifically, he contends that her preparation and actual testimony at trial was deficient in three respects: (1) she did not calculate appellant's score on an I.Q. test correctly; (2) she did not perform the proper psychological testing on him; and (3) her testimony did not set forth any meaningful insight into his psychological development.
 {¶ 143} As to the first assertion, this court would note that, pursuant to appellant's own evidentiary materials, the alleged errors in the calculation would have only resulted in a four-point change in the final result, i.e., from 84 to 80. Under Ohio law, there is a rebuttable presumption that a criminal defendant is not mentally retarded if the result of his IQ test is greater than 70. State v. Lott, 97 Ohio St.3d 303,2002-Ohio-6625. Thus, the difference in appellant's I.Q. would not have changed his basic status under the intelligence scale.[3] In light of the overwhelming nature of the aggravating circumstances in this case, this four-point error in calculation would not have altered the jury's weighing exercise in determining whether to recommend the death penalty.
 {¶ 144} In relation to the second assertion, we would indicate that the determination of which psychological test to perform was clearly within the discretion of Dr. McPherson. Although appellant's evidentiary materials were sufficient to show that other tests could have been performed, the materials did not establish that Dr. McPherson had acted below the standard of care for psychologists in choosing which test to perform. In other words, there is no indication in the record that Dr. McPherson's actions did not fall within the acceptable range for her profession.
 {¶ 145} Finally, as to the quality of Dr. McPherson's testimony, our review of the trial transcript shows that her testimony during the mitigation phase was clearly intended to emphasize certain facts about appellant's background, i.e., that he had attention deficit disorder and that he had been infatuated with Roberts. In the evidentiary materials attached to his postconviction petition, appellant merely raised the possibility that other aspects of his childhood should have been given greater emphasis by Dr. McPherson. There is nothing to suggest that Dr. McPherson's testimony was below the professional level of proper evaluation. Moreover, this disagreement in strategy is not sufficient to establish that appellant was denied access to proper expert assistance during his trial.
 {¶ 146} Pursuant to the foregoing analysis, this court concludes that the trial court did not err in rejecting appellant's claims regarding the competency of Dr. McPherson. Thus, his eleventh argument lacks merit.
 {¶ 147} In regard to his twelfth cause of action, appellant submits that the trial court should have vacated its original sentencing judgment because his evidentiary materials showed that the court's prior weighing exercise had been based on insufficient evidence. In support of this argument, appellant again cites Dr. McPherson's failure to refer to his miserable childhood during her testimony at trial.
 {¶ 148} Simply stated, appellant's this particular argument merely restates the basic points set forth under his eleventh cause of action. That is, appellant asserts that the trial court did not base its weighing exercise upon the proper facts because Dr. McPherson failed to emphasize those facts in her testimony. As to this point, this court would again indicate that the choice of which aspects of appellant's childhood to emphasize before the jury was a matter of strategy for trial counsel and professional judgment for Dr. McPherson. After reviewing the transcript of the mitigation phase, this court concludes that the trial court did not err in finding that Dr. McPherson's testimony set forth a viable mitigation argument for appellant.
 {¶ 149} Under his thirteenth cause of action, appellant contends that the trial court erred when it rejected his claim that the state's use of a lethal injection in the imposition of the death penalty constitutes cruel and unusual punishment. In regard to this point, we would first indicate that this claim does not raise an issue pertaining to the propriety of appellant's criminal trial. To this extent, a postconviction proceeding is not the proper legal context in which to litigate this issue; instead, this type of issue should be raised in a declaratory judgment or habeas corpus action.
 {¶ 150} Moreover, as to the substance of this argument, our review of the relevant case law shows that the basic assertions raised in the evidentiary materials relating to this point have previously been rejected as insufficient to establish that Ohio's use of the lethal-injection method is unconstitutional. SeeCooper v. Rimmer (6th Cir., 2004), 358 F.3d 655.
 {¶ 151} As to his fourteenth cause of action in his postconviction petition, appellant maintains that Ohio's postconviction relief procedure should be declared unconstitutional because the statutes create so many procedural hurdles for a criminal defendant to overcome that it is simply too difficult to obtain relief. As to this point, this court would first note that we have expressly held that the constitutionality of the postconviction procedure can only be properly challenged in a habeas corpus proceeding. State v.Wiles (1998), 126 Ohio App.3d 71. Furthermore, the appellate courts of this state have generally upheld the constitutionality of R.C. 2953.21 et seq. See, e.g., State v. Hutton, 8th Dist. No. 76348, 2004-Ohio-3731. In again raising this issue in the present case, appellant has failed to assert any new argument which would warrant the reconsideration of this matter.
 {¶ 152} In the fifteenth cause of action, appellant contends that even if this court finds no merit to his first fourteen causes of action, the "cumulative effect" of those causes of action violated his constitutional rights. Under the doctrine of cumulative error, a judgment can be reversed when the cumulative effect of numerous errors deprives a defendant of his constitutional rights, even if the individual errors are so small that not one in particular rises to the level of prejudicial error. State v. DeMarco (1987), 31 Ohio St.3d 191, 196-197.
 {¶ 153} However, it is clear appellant failed to demonstrate that even one cause of action amounted to harmless error. Although there were some instances in which the trial court's res judicata analysis was incorrect, there was no need for any harmless error analysis in regard to the trial court's findings as to the actual substance of the claims for postconviction relief. To this extent, the cumulative effect amounts to nothing.
 {¶ 154} Based upon the foregoing analysis, appellant's sixth assignment of error is without merit.
 {¶ 155} The judgment of the trial court is hereby affirmed.
Colleen Mary O'Toole, J., concurs, William M. O'Neill, J., concurs with Concurring Opinion.
[1] Although appellant has raised certain questions pertaining to his intelligence level under his sixth assignment, no such issues have been asserted in his second assignment of error.
[2] In disposing of appellant's contentions concerning the underrepresentation of African-Americans on the petit jury, this court considered appellant's two supplemental submissions which were filed after oral arguments in this appeal.
[3] In addition to recalculating the final score based upon the findings of Dr. McPherson, the new psychologist also administered a new "I.Q." test on appellant. Although the final score of the new test was different than the proper score under Dr. McPherson's test, it still did not fall within the range of scores which must be found in order for a person to be considered mentally retarded.