OPINION
{¶ 1} This appeal is taken from the final judgment of the Portage County Court of Common Pleas. Appellant, Tyrone Lee Noling, appeals from the trial court's decision dismissing his successive petition for post-conviction relief. After careful consideration of the arguments submitted by appellant, we affirm.
 {¶ 2} Factual and Procedural Overlay *Page 2 
 {¶ 3} On August 18, 1995, the Portage County Grand Jury indicted appellant for his involvement in the murders of Bearnhardt and Cora Hartig. The indictment charged appellant with two counts of aggravated murder, with each count including specifications of aggravating circumstances pursuant to R.C. 2929.04(A)(3) and 2929.04(A)(7). Appellant was additionally indicted on two counts of aggravated robbery and one count of aggravated burglary. All charges included a firearm specification alleging appellant possessed a firearm on or about his person or under his control while committing the offenses.
 {¶ 4} After trial, the jury entered a verdict of guilty on all counts including the charged specifications. The trial court then entered the penalty phase after which the jury returned a recommendation that the court impose the death penalty. The trial court independently concluded that the death penalty was warranted and entered the sentence on record. The court also ordered appellant to serve consecutive sentences for the remaining three counts and for the firearm specifications. Appellant appealed his convictions and sentence to this court and, in State v.Noling (June 30, 1999), 11th Dist. No. 96-P-126, 1999 Ohio App. LEXIS 3095 (Noling I), this court affirmed the same. Appellant subsequently appealed this court's decision to the Supreme Court of Ohio and, inState v. Noling, 98 Ohio St.3d 44, 2002-Ohio-7044, this court's judgment was affirmed.
 {¶ 5} On July 23, 1997 appellant filed a petition for postconviction relief pursuant to R.C. 2953.21. In his petition, appellant asserted various claims for relief, including: (1) actual innocence; (2) prosecutorial misconduct; (3) withholding of exculpatory evidence; and (4) ineffective assistance of counsel. The trial court *Page 3 
considered appellant's claims and issued a decision on April 9, 1998, dismissing appellant's petition concluding there were no substantive grounds for relief. Appellant appealed the trial court's dismissal and, in State v. Noling, 11th Dist. No. 98-P-0049, 2003-Ohio-5008 (NolingII), this court affirmed the trial court's judgment entry. Appellant subsequently appealed to the Supreme Court; however, in State v.Noling, 101 Ohio St.3d 1424, 2004-Ohio-123, appellant's appeal was denied.
 {¶ 6} On June 30, 2004, appellant commenced a federal habeas corpus action in the Northern District of Ohio. On August 29, 2005, appellant filed a request for discovery in the District Court which was denied on November 4, 2007. The court determined appellant's motion was "an effort to re-litigate his state court proceedings and require [the District] Court to re-adjudicate findings of fact." Appellant's motion for reconsideration was denied. The District Court also denied appellant's motion for an evidentiary hearing along with a subsequent motion for reconsideration.
 {¶ 7} On August 14, 2006, the Cleveland Plain Dealer published an article premised upon appellant's case. The article's heading read. "Lies put man on death row, three claim Portage investigator used coaching, threats to get confessions, men say." The record indicates that the Plain Dealer was able to obtain various pieces of evidence via a public records request. In so doing, appellant alleges the paper uncovered previously undisclosed statements and interviews which he maintains exculpate him from criminal liability. Appellant admits that the evidence obtained by the Plain Dealer is "the crux of the appeal before this court."
 {¶ 8} Following the publication of the article, appellant moved the District Court to stay the Federal case and hold in abeyance pending exhaustion of remedies in the *Page 4 
state court. The District Court denied the motion, stating appellant had failed to provide the court with an explanation as to why he did not fully explore these claims after a previous article, published in the Cleveland Scene Magazine on September 10, 2003, entitled "The Unlikely Triggerman," had set forth much of the same information as that contained in the Plain Dealer.
 {¶ 9} On November 3, 2006, appellant filed a second round of actions with the trial court including a successive petition for postconviction relief pursuant to R.C. 2953.23(A)(1), leave to file a motion for new trial pursuant to R.C. 2945.79(B), (F), and Crim. R. 33, with a motion for new trial, a motion for relief from judgment pursuant to Civ. R. 60(B), a motion for discovery, and a motion for funds for an expert witness.
 {¶ 10} The parties were given the opportunity to address the court and offer their respective legal arguments. After considering the arguments, the trial court dismissed appellant's successive petition and motion for new trial finding appellant's "new evidence presented does not meet the standards for granting a new trial or successive petition for postconviction relief." The trial court further overruled appellant's Civ. R. 60(B) motion based upon untimeliness; the trial court finally rendered appellant's motion for discovery and motion to appoint an expert witness moot. Appellant now appeals the trial court's rulings.
 {¶ 11} Discussion and Analysis
 {¶ 12} Appellant's first assignment of error asserts:
 {¶ 13} "The trial court abused its discretion when it found that the factual evidence Noling presented did not meet the standards for a successor postconviction petition or new trial motion." *Page 5 
 {¶ 14} Before addressing the substantive features of appellant's first assignment of error, we must first address certain procedural issues raised in appellant's brief. First, appellant contends the trial court erred in failing to make a complete statement of factual findings. The Supreme Court of Ohio has held that a trial court is under no duty to issue findings of fact and conclusions of law on a successive petition for postconviction relief which alleges the same grounds as earlier petitions. State ex rel. Workman v. McGrath (1988), 40 Ohio St.3d 91. As the grounds for appellant's successive petition mirror his original petition, his contention lacks merit.
 {¶ 15} Appellant also takes issue with the trial court's reference to his Federal District Court case in its judgment entry. Specifically, appellant argues the trial court erred in relying upon the District Court's judgment entry denying his motion to stay and hold in abeyance. Irrespective of the trial court's mention of the Federal Court's determination, the trial court determined appellant failed to meet R.C. 2953.23(A)(1), the Ohio statute bestowing jurisdiction on a trial court to entertain a successive petition for postconviction relief. As the merit of that decision is being challenged on appeal, we shall not engage in a discussion as to the import of the trial court's reference to the Federal Court case.
 {¶ 16} With these issues addressed, we shall now consider the substantive arguments relating to appellant's first assignment of error. Appellant premised his successive petition for postconviction relief and new trial motion upon 22 claims of relief. These claims can be condensed into several specific claims. For ease of discussion, these grounds will be reduced to three distinct categories of evidence: (1) Brady evidence pertaining to alleged suppressed exculpatory material; (2) Ineffective *Page 6 
assistance of counsel relating to evidence trial counsel possessed at trial but failed to utilize; and (3) Evidence in the form of post-trial affidavit testimony. We shall address each category in turn. Before analyzing the foregoing evidence, we shall briefly adumbrate the content of each category.
 {¶ 17} Alleged Brady evidence
 {¶ 18} Appellant first alleges his due process right to a fair trial was violated when the prosecution withheld material exculpatory evidence contrary to Brady v. Maryland (1963), 373 U.S. 83. In support of hisBrady claims, appellant asserts the prosecution withheld significant evidence illustrating witness inconsistencies that could have been used to undermine the state's theory of the case. Specifically, appellant claims that trial counsel was not provided the grand jury transcript of Kenneth Garcia, "the fence" to whom Joseph Dalesandro sold weapons after the commission of the murders. Appellant maintains that had trial counsel received the transcript, it could have been used to show that the state's investigator, Ron Craig, allegedly coerced witnesses into providing false testimony against appellant. Moreover, had counsel possessed the transcript, they could have demonstrated that Garcia was uncertain as to whether Dalesandro had sold him two or three guns.
 {¶ 19} Appellant also claims that trial counsel was not provided three different versions of an investigator's summaries of interviews with Gary St. Clair, investigator notes regarding Julie Mellon, Dalesandro, and Butch Wolcott, information that Officer Mucklo allegedly searched the glove box of the vehicle and found no weapon, and the grand jury transcripts of Dalesandro, Jill Hall, Mellon, and Robyn Elliot. Appellant maintains had counsel received these items, they could have been used to impeach the *Page 7 
testimony of the state's trial witnesses, as well as the trustworthiness of the state's theory, by pointing to alleged inconsistencies in testimony thereby challenging their credibility.
 {¶ 20} Appellant additionally claims that trial counsel was not provided Dr. Cannone's witness statement, a complete phone record, investigator notes summarizing information regarding a possible second insurance agent acquainted with the victim's, and investigator notes of interviews with Doris Jones, Jim Geib and Lewis Lehman. Appellant asserts that had counsel received these items, they could have been used to establish an alternative suspect defense.
 {¶ 21} Alleged Ineffective Assistance of Counsel
 {¶ 22} Appellant asserts four instances of ineffective assistance of counsel. First, appellant relies upon an affidavit from his first postconviction counsel prepared for purposes of filing the instant motion, crime scene reports, and witness interviews to show his trial counsels' alleged ineffectiveness for failing to pursue an alternative suspect defense at trial. Next, appellant relies on the pretrial competency report of St. Clair and affidavits of Dr. Richard Ofshe attesting that St. Clair's mental condition made him susceptible to coercive tactics. Appellant asserts trial counsels' failure to argue that the state compelled allegedly false testimony rendered their assistance ineffective. Third, relying upon Dr. Ofshe's affidavits as well as the pretrial 1992 and 1995 letters from Dr. Alfred Grzegorek, appellant argues trial counsel were ineffective for failing to conduct an investigation into Wolcott's repressed memories of the crime. Finally, appellant relies upon various pretrial statements made by Hall, Dalesandro, Wolcott, and St. Clair that trial counsel possessed but did not use for purposes of impeaching *Page 8 
these witnesses at trial. Appellant contends counsels' failure to cross-examine these witness on their alleged inconsistencies rendered their assistance ineffective.
 {¶ 23} Further, appellant relies on trial counsels' affidavits and the two pretrial letters from Dr. Grzegorek in support of his claim that the state presented false evidence, via coercive police tactics, in violation of his constitutional rights. Because counsel was in possession of the psychologist's letters, appellant asserts they were ineffective for failing to pursue a "fabrication defense."
 {¶ 24} Allegation of Actual Innocence
 {¶ 25} Appellant, using all exhibits attached to his successive petition, argues that he is innocent. He asserts he has always maintained his innocence, his accomplices have recanted their former testimony and/or statements, there was no murder weapon found, and no evidence that appellant had knowledge of the murders before the media released the information.
 {¶ 26} Successive Petition for Postconviction Relief
 {¶ 27} R.C. 2953.21 governs successive petitions for postconviction relief and provides:
 {¶ 28} "(A) * * * [A] court may not entertain * * * a second petition or successive petitions for similar relief on behalf of a petitioner unless division (A)(1) or (2) of this section applies:
 {¶ 29} "(1) Both of the following apply:
 {¶ 30} "(a) * * * the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief * * * *Page 9 
 {¶ 31} "(b) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted * * *.
 {¶ 32} "(2) [This section applies where DNA evidence proves actual innocence of the petitioner and thus is not applicable to the instant matter]."
 {¶ 33} Accordingly, to avoid dismissal, appellant bore the burden of demonstrating he was unavoidably prevented from the discovery of the facts upon which his claim was based, and that, but for the alleged constitutional error at trial, he would not have been found guilty of the offense.
 {¶ 34} The decision to entertain a second or successive petition for postconviction relief and motion for a new trial rests in the sound discretion of the trial court. See, State v. Hayden, 2d Dist. No. 21764,2007-Ohio-5572, at ¶ 12. A trial court's decision will not be disturbed on appeal save a clear showing of an abuse of discretion. State v.Perdue (1981), 2 Ohio App.3d 285, 286. An abuse of discretion implies more than an error of law or judgment; rather, it indicates the court's attitude was unreasonable, arbitrary, or unconscionable.Hayden, supra.
 {¶ 35} Evidence Relating to Appellant's Brady claim
 {¶ 36} This evidence includes (1) grand jury testimony of Kenneth "Chico" Garcia, Dalesandro, St. Clair, Jill Hall, Julie Mellon and Robyn Elliott; (2) a complete copy of the Hartig's phone records; (3) investigator notes regarding interviews with Doris Jones, William LeFever, Lewis Lehman, Mellon, St. Clair, Dalesandro, and Wolcott; and (4) information regarding Officer Mucklo's search of the vehicle. Appellant *Page 10 
asserts he was unavoidably prevented from discovering this evidence and, if it were used, no reasonable juror would have found him guilty.
 {¶ 37} Pursuant to Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. However, as indicated above, a party seeking to file a successive petition for postconviction relief must meet the jurisdictional requirements of R.C. 2953.23(A)(1). As the trial court dismissed appellant's successive petition based upon his failure to meet these statutory requirements, our analysis shall be confined to the propriety of the trial court's decision. That is, although the foregoing evidence is premised upon alleged Brady violations, our sole charge in this appeal is to determine whether the evidentiary material in question meets the threshold requirements of R.C. 2953.23(A)(1)(a) and (b).
 {¶ 38} As indicated above, to submit a viable successive petition for post conviction relief, appellant was required to demonstrate (1) he was unavoidably prevented from the discovery of the facts upon which his claim was based, and (2) but for the alleged error at trial, he would not have been found guilty of the offense. R.C. 2953.23(A)(1)(a) and (b). The phrase "unavoidably prevented" implies a defendant was unaware of the facts at issue and was unable to learn of them through reasonable diligence. State v. McDonald, 6th Dist. No. E-04-009, 2005-Ohio-798, at ¶ 19.
 {¶ 39} First, while the evidence of the inconsistencies within the grand jury testimony of the above mentioned witnesses could have been used as impeachment material at trial, courts have held that impeachment evidence is insufficient to invoke a *Page 11 
trial court's jurisdiction for purposes of entertaining a successive petition for post conviction relief. State v. Beuke (1998),130 Ohio App.3d 633, 637, citing State v. Poindexter (Aug. 29, 1997), 1st Dist. No. C-960780, 1997 Ohio App. LEXIS 3812, *8-*9. This principle notwithstanding, analysis of the evidence indicates that appellant cannot meet his statutory burden under R.C. 2953.23.
 {¶ 40} With respect to the first prong of the test, appellant cannot demonstrate he was unavoidably prevented from discovering the alleged inconsistencies within the grand jury testimony of Dalesandro, Hall, St. Clair, Garcia, and Elliot. Each of these individuals' names was on the witness list provided by the state prior to appellant's trial. Trial counsel could have moved the trial court to release the testimony upon a showing of a particularized need. Although trial counsel failed to do so, this omission does not imply appellant was unavoidably prevented from discovering the testimony. However, assuming arguendo, appellant was unavoidably prevented from obtaining the evidence contained in the grand jury transcripts, we hold the evidence was not so compelling that no reasonable trier of fact would have found him not guilty.
 {¶ 41} With respect to the Garcia evidence, appellant claims that the grand jury transcript reveals Garcia was threatened by the prosecution's investigator, Ron Craig, into cooperating. However, the testimony reveals that he was pleased to speak with the assistant prosecutor conducting the grand jury examination as opposed to Craig because Craig "scared" him. There is no evidence that Garcia was reluctant to discuss his receipt of the firearms from Dalesandro and the transcript of his grand jury testimony reveals a forthcoming and cooperative attitude. Appellant further asserts after Craig threatened Garcia, he changed his statement regarding how many hand guns *Page 12 
Dalesandro sold him from one to two. During his grand jury testimony, Garcia admits he failed to tell Craig about the second hand gun; however, this admission follows Garcia's statement regarding how Craig frightened him. While trial counsel may have used this evidence at trial, we do not believe its inclusion provides clear and convincing evidence that a reasonable juror would acquit after considering its relative merits.
 {¶ 42} Next, fellow accomplice Gary St. Clair's grand jury testimony indicated that he did not witness appellant shoot the victims and did not hear what was said between appellant and the victims prior to the shooting. However, notes from an interview between St. Clair and investigator Ron Craig indicate St. Clair observed appellant shooting down at someone who was evidently on the floor and also heard appellant arguing with the male victim. While the statements do not match, they are not completely inconsistent. The interview notes state that although St. Clair observed appellant shooting downwards, they also state he did not know who was being shot, i.e., he did not strictly observe appellant shooting the victim. Moreover, in his grand jury examination, St. Clair testified he heard a "[l]ittle argument between the Hartigs and Tyrone Noling." The interview notes demonstrate St. Clair heard appellant exclaim, "Shut up" and Mr. Hartig respond, "I'm not shutting up, this is my house." Although these do not absolutely match, any credibility evidence gleaned from their comparison would be negligible. When viewed together they fail to refute the state's case that St. Clair and appellant were in the house together and appellant shot the victims.
 {¶ 43} Appellant additionally points to alleged inconsistencies between Dalesandro's police interview, his grand jury testimony, and his trial testimony. A review *Page 13 
of the newly discovered documents in conjunction with Dalesadro's trial testimony fails to reveal any material inconsistencies.
 {¶ 44} Appellant first points to alleged inconsistencies with respect to why appellant committed the crimes. In his interview, Dalesandro indicated appellant shot the victims both because they were "hostile" and to eliminate witnesses. At trial, he testified appellant admitted he committed the murders because "he didn't want any witnesses." The omission of the testimony of the victims' alleged hostility is inconsequential because it does not contradict or in any way compete with appellant's assertion relating to the elimination of witnesses.
 {¶ 45} Next, appellant directs our attention to alleged inconsistencies regarding Dalesandro's characterization of appellant's and St.Clair's interaction after the commission of the crimes. The interview notes indicate Dalesandro overheard an intense argument between appellant and St. Clair immediately subsequent to the murders. Dalesandro's grand jury and trial testimony reflect roughly the same information, the only difference between the notes and testimony is the notes provide slightly more detail regarding the substance of what Dalesandro overheard. In our view, the omission of the details from the interview (which was transcribed in a fragmented fashion by police) and the testimony before the grand jury as well as at trial do not compromise Dalesandro's credibility because it does not represent a true inconsistency or contradiction.
 {¶ 46} Further, appellant points out Dalesandro's statements regarding where each accomplice was sitting in his car were inconsistent. Specifically, Dalesandro testified before the grand jury that, prior to the murders, he was driving his car, appellant *Page 14 
was in the passenger seat, St. Clair was in the back on the left, and Wolcott was in the back on the right. At trial, however, he switched the locations of St. Clair and Wolcott. In our view, such a mistake is coincidental and has no bearing on Dalesandro's ultimate credibility.
 {¶ 47} Finally, appellant points to an alleged inconsistency when, before the grand jury, Dalesandro testified appellant "had that gun that they stole from the first robbery" while, at trial, he stated, all together, there were two small handguns in the vehicle after the murders. We see no specific inconsistency in this testimony. Simply because Dalesandro identified a particular gun in appellant's possession does not preclude the existence of a second gun in the vehicle or, for that matter, also in appellant's possession. In sum, the alleged inconsistencies identified by appellant relating to Dalesandro do not clearly and convincingly show that no reasonable juror would have found appellant guilty had the evidence been before it.
 {¶ 48} Appellant also relies on various interview notes and grand jury testimony allegedly demonstrating "an underhanded plot, with witnesses coerced and threatened if they did not say what [Investigator] Craig wanted them to say." This issue was brought to the jury's attention during appellant's trial via Dalesandro's as well as St. Clair's testimony. Dalesandro testified that police had "yelled" at him during interviews and instructed him that he "better cooperate." Further, at trial, St. Clair recanted his prior statement implicating appellant as the principal in the murders. He stated that, prior to making the statement, he feared he would receive the death penalty if he did not enter a plea. He then testified that Craig "helped" him create his statement because, at the time, he was "lost." *Page 15 
 {¶ 49} Moreover, the issue of the allegedly coerced confessions was broached in appellant's initial post conviction relief petition. SeeNoling II, at ¶ 47-49. In that case, Dalesandro, St. Clair, and Wolcott submitted affidavits in which they averred, contrary to their prior statements and/or trial testimony, that they were not involved in the murders. Id. at ¶ 25. Specifically, Wolcott stated that Craig lied about having an eye witness and physical evidence connecting him to the murders and, in addition, filled Wolcott's head with memories of being at the murder. Delasandro's affidavit stated that he was not involved in the murder and he was coached by Craig who pressured him into cooperating with the prosecution's version of the case. St. Clair averred that his testimony at trial was the product of intimidation and suggestion by Craig. In dismissing appellant's petition, the trial court concluded that the affidavits were not credible as each accomplice was interested in the success of appellant's efforts on postconviction. On appeal, this court rejected appellant's theory of coercion and accepted the trial court's determination that his accomplices' sworn testimony relating to the alleged coercion was not credible. Id.
 {¶ 50} Although appellant brings forth additional evidence of alleged coercion in the form of grand jury testimony, witness statements, and police interview notes, he previously produced substantially similar evidence reflecting what he deems coercive police practices. The thrust of this evidence has been considered and rejected. While the additional evidence echoes the substance of the affidavits set forth in appellant's original postconviction petition, it does not confirm appellant's contention that Craig used untoward, compulsory practices to obtain the original testimony or statements of Dalesandro, St. Clair, or Wolcott. Accordingly, we do not believe appellant has shown, *Page 16 
by clear and convincing evidence that, with the inclusion of this evidence, no reasonable jury would have found him guilty.
 {¶ 51} Next, appellant directs our attention to alleged inconsistencies between Jill Hall's grand jury testimony and her trial testimony. Specifically, before the grand jury, Hall testified that Wolcott spoke with her on the day following the murders. She stated he was very upset and kept repeating "everything went wrong" and "it wasn't supposed to happen like this." Hall testified Wolcott ultimately admitted being involved in the murders "as a lookout," but disclosed to Hall that "Ty pulled the trigger. Ty shot him." When Hall asked who was with them, he stated "Ty was there and he had mentioned Gary Sinclair [sic], Joey Delisadro [sic], and he had said his brother." At trial, however, Hall did not mention Wolcott's statement regarding "his brother."
 {¶ 52} Although Hall did not mention Wolcott's statement regarding "his brother," such an omission is harmless. We do not see how the failure to disclose would have been so influential as to fundamentally undermine Hall's testimony regarding Wolcott's admission. This evidence fails to meet the second prong of the successive petitions test.
 {¶ 53} Next, appellant points to alleged inconsistencies between Julie Mellon's police interview and her grand jury testimony.[1] During the interview, Mellon stated that when Wolcott entered Hall's apartment on April 6, 1990, he was "shook up," there was a robbery, and "Tyrone freaked out." During her grand jury testimony, Mellon testified the same; however, she additionally testified that she observed Hall questioning Wolcott and heard him admit "that some people died." Although Mellon's initial report did not *Page 17 
include the information regarding the killings, the omission is not so important as to question the credibility of events as construed by the state. First, Mellon was not asked to testify and therefore the jury would not have had an opportunity to judge the credibility of her story; however, even had appellant been in possession of the materials at issue, such an omission could have been explained by recourse to nervousness and a consequent failure of memory. In any event, the statement and grand jury testimony serve to implicate appellant in the crimes, rather than exculpate him from them. As such, we do not believe their presentation to the jury would have in any way affected the outcome of the case.
 {¶ 54} Appellant next points to purported inconsistencies between Robyn Elliot's grand jury testimony and her trial testimony. After reviewing both transcripts, we see no apparent inconsistencies or contradictions in her testimony. Elliot testified before the grand jury that she was at a party with various friends, including appellant, on Saturday, April 7, 1990; however, she testified she could not be certain whether it was Saturday or Sunday. At trial, she testified she was sure it was Saturday, April 7 because "[t]here was no school the next day, we wouldn't be out that late." Although she expressed some uncertainty before the grand jury, her trial testimony does not necessarily contradict her original perception; rather, it merely indicates she had time to consider the date more carefully in preparation for her testimony.
 {¶ 55} Elliot further testified before the grand jury that, after a police car drove past the Trandafir residence (the location of the party at which appellant, his accomplices, and others, including Elliot, convened), appellant became "hysterical or something. He started saying that [Wolcott] told on him and stuff." Alternatively, at trial, *Page 18 
she testified that, after the cruiser passed, appellant "grabbed [Wolcott], started screaming at him, said he was going to kill him, he better not have told." Although Elliot did not mention the threat before the grand jury, the substance of her testimony did not change. She conveyed appellant became highly agitated toward Wolcott due to his apparent belief that Wolcott had told the police of his misdoings.
 {¶ 56} Finally, before the grand jury, Elliot testified appellant asked her, while at the Trandafir residence, if she was aware of two "old people getting killed in Atwater." She testified appellant, and his cohorts began laughing subsequent to the question. Alternatively, at trial, when asked if anybody else at the party overheard their conversation, Elliot replied, "There was a lot of people in the room talking, so I guess not, I don't know." Appellant maintains her grand jury testimony implies this discussion occurred aloud for all to hear thereby contradicting her trial testimony. Irrespective of appellant's interpretation, we do not believe Elliot's testimony relating to appellant's question exhibits any inherent inconsistency. Her trial testimony indicates appellant asked her the question in a manner that everyone in the room could have heard were they not conversing amongst themselves; however, she nonetheless qualified her answer by admitting she did not know if others had overheard.
 {¶ 57} When taken as a whole, we see no necessary contradictions or fatal inconsistencies between Elliot's grand jury testimony and her trial testimony. We therefore hold that this evidence fails to meet the second prong of the successive petition test pursuant to R.C. 2953.23(A).
 {¶ 58} Appellant also asserts Brady violations relating to his "alternate suspect" theory. Specifically, appellant points to an interview with Jim Geib, one of the victim's *Page 19 
neighbors, who described a dark blue midsize car leaving the "general location" of the crime scene on the date and near the time of the murders. According to Geib, there was a male driving the car with black hair in his 30s. In connection with this statement, appellant points to a suppressed police interview with one William LeFever, the victim's insurance agent, who "fits with [the] Jim Geib description." Appellant alleges the interview was particularly significant in light of Dr. Daniel Cannone's reference to an insurance agent, William Lehman, who owed the victims $10,000 from a previous loan and who had admitted he formerly owned a .25 handgun.[2] Appellant further contends that truncated notes from an interview with one Doris Jones would have assisted in establishing an alternative suspect. The interview notes indicate Mr. Hartig told Jones' husband that he had money in his house but nobody would ever find it.[3]
 {¶ 59} Although this evidence would have assisted in constructing an alternative suspect(s) theory which would compete with the state's theory of appellant's case, it is not so compelling that its presentation would have impugned the jury's verdict. Geib's statement only indicated an individual was leaving the general vicinity of the crime *Page 20 
scene on the day of the murders. Although the police notes indicate LeFever matched Geib's description of the driver, the police investigated LeFever and Lehman subsequent to the murders (Jim Geib's statement was given on April 10, 1990), and evidently determined not to pursue them as suspects in the crimes. Even when the newly discovered evidence is viewed in conjunction with the information provided by Dr. Cannone and Lehman's ultimate admission that he had previously owned a .25 handgun, the alternative suspect theory is still highly speculative. When compared with the evidence put forth by the state, we do not believe the existence of the alternative suspect(s) evidence clearly and convincingly shows no reasonable juror would have found appellant guilty.
 {¶ 60} Appellant further relies on an investigator's report that refers to Lehman's refusal to take a polygraph test in support of hisBrady claim. First, the report does not indicate Lehman specifically refused to take a polygraph; rather, the report relates "[Lehman] stated that he was concerned as to their accuracy and it was his desire to consult with someone before submitting to that type of test." Although Lehman may not have submitted to a polygraph, the report submitted as an exhibit in support of the instant petition does not imply an outright refusal on Lehman's behalf. However, assuming Lehman's representations constitute a refusal, the identity of Lehman, his alleged connection to the Hartigs, and the fact that he owned a .25 caliber handgun was all information that was known and utilized in appellant's first petition for postconviction relief. Even when viewed together with this material, the evidence fails to meet the second prong of the successive petitions test.[4] *Page 21 
 {¶ 61} Appellant additionally relies on information that Detective William Mucklo provided to the Cleveland Plain Dealer relating to his alleged search of the Dalesandro's vehicle. The Plain Dealer reported that Detective Mucklo "searched Dalesandro's car the day of Noling's arrest and didn't find a gun." This information appears to be taken directly from the Plain Dealer article dedicated to Noling's case. The record does not specifically reveal an affidavit or deposition testimony from Mucklo to substantiate the claim. As such, there is a legitimate question as to the credibility of the information allegedly communicated by Detective Mucklo. Moreover, the hearsay quality of the statement to the Plain Dealer renders the evidence, at this stage, inadequate to meet the second prong.
 {¶ 62} Furthermore, and perhaps more significantly, at trial, Dalesandro testified he was released by authorities on the same day he, Noling, St. Clair, and Wolcott were arrested (i.e., April 9, 1990). After his release, he then returned to the Trandifir residence to retrieve his vehicle. According to Dalesandro, the vehicle had neither been impounded nor searched at this point. He testified Noling later called him from jail and told him to dispose of a gun located in the glove box. Dalesandro testified he did not realize there was a gun in the glove compartment; however, he testified he found it and complied with Noling's order by later selling it to Chico Garcia. As indicated above, Garcia stated, in an interview, that he received a second .25 caliber handgun and ultimately sold it.
 {¶ 63} Appellant and his counsel were aware at trial that the murder weapon was never recovered. Moreover, the evidence regarding Dalesandro's retrieval and subsequent disposal of the second gun was set forth at trial. Detective Mucklo also *Page 22 
testified at trial, but did not broach the issue of the search alluded to in the Plain Dealer article. Even had Mucklo testified to finding no weapon after searching the car, this evidence is easily reconcilable with Dalesandro's testimony. Put simply, given the evidence, a reasonable factfinder could conclude Mucklo's purported search occurred after the retrieval of the second weapon. Accordingly, this evidence fails to meet the first prong of the R.C. 2953.23(A)(1) inquiry.
 {¶ 64} As indicated supra, much of the evidence to which appellant directs our attention was either available or could have been discovered prior to the filing of his successive petition for postconviction relief. As such, he was not unavoidably prevented from discovering these facts. However, assuming arguendo appellant could prove "unavoidable prevention," a careful review of the newly discovered evidence in its totality fails to show, by clear and convincing evidence that, but for the alleged Brady errors, no reasonable factfinder would have found appellant guilty. Accordingly, the evidence based upon the allegedBrady errors fails to meet the statutory criteria for a successive petition for postconviction relief. In this respect, the trial court properly dismissed the petition.
 {¶ 65} Evidence Relating to Alleged Ineffective Assistance ofCounsel
 {¶ 66} This evidence includes documents and information that trial counsel had in their possession at the time of trial, including: (1) two pretrial letters from Dr. Grzegorek, dated July 6, 1992 and December 21, 1995, pertaining to Wolcott's psychological condition; (2) information regarding Lewis Lehman's and William LeFever's possible business relationship with the victims; and (3) evidence that should have led trial counsel to pursue a fabrication defense based upon witness coercion. *Page 23 
 {¶ 67} To show counsel was ineffective a party must put forth evidence to satisfy the two-pronged test set forth in Strickland v.Washington (1984), 466 U.S. 668. However, as indicated above, a party filing a successive petition for postconviction relief must meet the jurisdictional requirements of R.C. 2953.23(A)(1) before the merits of the ineffectiveness claim can be entertained. As the trial court held appellant's evidence could not meet these standards, our review is limited to assessing the propriety of the trial court's holding.
 {¶ 68} Throughout his brief, appellant admits the evidence at issue was in trial counsels' possession but was simply not utilized. To meet the jurisdictional requirements for filing a successive petition for postconviction relief, a petitioner must first demonstrate he was unavoidably prevented from discovering the facts upon which he relies. If trial counsel possessed the evidence at issue at the time of trial, it was available for use at trial. Therefore, appellant was not unavoidably prevented from its discovery.
 {¶ 69} However, appellant asserts, even though his trial counsel were in possession of this evidence, they failed to use it, thereby rendering their assistance ineffective. Moreover, appellant asserts he was unaware of its existence because his trial counsel failed to turn over the evidence at the time of his first postconviction relief petition. As a result, appellant argues he was unavoidably prevented from utilizing the evidence until he uncovered it, i.e., until filing his successive petition. With this argument in mind, we shall assume appellant was unavoidably prevented from discovering the evidence and assess whether the ineffective assistance of counsel *Page 24 
evidence clearly and convincingly demonstrates that no reasonable juror would find him guilty upon its consideration.
 {¶ 70} The two pretrial psychological evaluations submitted to the state by Dr. Grzegorek indicate Wolcott suffered from a spotty memory relating to the incident possibly resulting from sexual abuse he experienced as a child. Dr. Grzegorek theorized that victims of sexual abuse often question whether they are remembering events as they occurred or merely fabricating a memory that never happened. Dr. Grzegorek noted that Wolcott was certain that the abuse he suffered occurred, he nevertheless questioned whether he had an accurate recall of the events and whether he was somehow responsible for the abuse. Dr. Grzegorek hypothesized the same mechanism may be at work regarding Wolcott's memory processes as they relate to the murders.
 {¶ 71} When he was evaluated, Wolcott's memory of the crimes was "spotty" and he was unable to provide a totally integrated remembrance of the events. He questioned whether what he was remembering was real or "part of `going crazy.'" In light of the foregoing assessment, appellant maintains trial counsel should have used these letters to challenge the nature of Wolcott's recollection of the events. Appellant contends counsel could have directed the jury's attention to potential gaps in Wolcott's memory and query the manner in which they were "filled," i.e., potentially via suggestive police techniques. Appellant further points out that this evidence would have been particularly compelling in light of the fact that the state granted Wolcott immunity from prosecution in exchange for his testimony. *Page 25 
 {¶ 72} We first point out that Wolcott's poor memory was an issue at trial. Defense counsel pointed out that Wolcott had multiple visits with Dr. Grzegorek in an effort to assess and improve Wolcott's memory. Defense counsel underscored various facets of Wolcott's poor memory and directed the jury's attention to the fact that the state had afforded Wolcott immunity. Although Dr. Grzegorek's assessment may have been additionally useful to undermining Wolcott's credibility, it is also somewhat cumulative in light of defense counsel's cross-examination. The evaluation provides more detail into the doctor's professional explanation of why Wolcott may have been experiencing memory lapses; however, the assessment also indicates Dr. Grzegorek's belief that Wolcott had a good deal of information that could still be accessed using proper, non-suggestive techniques. In particular, Dr. Grzegorek pointed out that the state should persist with firm but non-pressured interviews of Wolcott to assist in reclaiming a more detailed recollection of the events.
 {¶ 73} Overall, the doctor's assessment indicated his belief that Wolcott was involved in the crime in that he accompanied Noling, Dalesandro, and St. Clair to the victim's residence on the night of the murders. As such, Dr. Grzegorek's did not represent that the memories Wolcott possessed were somehow fabricated or hallucinatory. Because the substantive evidence of Wolcott's memory problems along with his immunity order were presented to the jury and because Dr. Grzegorek's evaluation indicates Wolcott's recognitions, while "spotty," were accurate, we do not believe the evidence of his formal assessments clearly and convincingly demonstrate no reasonable factfinder would have found appellant guilty. *Page 26 
 {¶ 74} Next, appellant asserts the police documentation, crime scene report, and LeFever interview should have been used to establish an alternative suspect. As discussed above, Lehman previously owned a .25 caliber handgun, similar to the weapon used in the murder. Further, appellant contends the crime scene report notes indicate the victims appeared to be seated at the table facing the door; in his interview with police, LeFever stated the Hartigs "always conducted their business at the kitchen table." Further, the crime scene report stated the victims' residence showed no evidence of struggle and, while a desk was ransacked and papers were scattered over the floor, Mr. Hartigs' wallet was undisturbed.
 {¶ 75} The foregoing evidence may have been useful to assail the state's theory of the case. However, as we indicated in our analysis of appellant's Brady claim relating to his alternate suspect theory, in light of the evidence produced against appellant, we do not believe it clearly and convincingly demonstrates that no reasonable factfinder would have found appellant guilty of the murders even had it been submitted as a defense.
 {¶ 76} Next, appellant contends that trial counsel possessed, and failed to use, evidence that should have led them to pursue a fabrication defense based upon alleged coerced testimony.
 {¶ 77} First, he points to a 1990 police interview with Jill Hall. In the interview, Hall does not mention the murder; however, in 1992, she claimed Wolcott told her about the murder. Although counsel did not utilize the inconsistent statements to impeach Hall at trial, we do not see how the differences in the statements reflect coercion on the *Page 27 
part of authorities. As it relates to both impeachment and the allegation of coercion, this evidence fails to meet the second prong of R.C. 2953.23(A)(1).
 {¶ 78} Next, appellant notes trial counsel should have utilized St. Clair's 1993 statement suggesting Ron Craig had threatened him. According to the statement, Craig told St. Clair that victims in a robbery committed by appellant would testify against him if he did not cooperate. St. Clair did not participate in the robbery. Appellant further points out counsel could have used St. Clair's competency evaluation, indicating he was of borderline intelligence, to show he was susceptible to coercive tactics. Although such information could have been used to help undermine the process leading to the charges being filed, we do not think it clearly and convincingly demonstrates, given the evidence implicating appellant in the murders, no reasonable juror would find him guilty.
 {¶ 79} When viewed as a whole, we do not believe the foregoing evidence meets the requirements of R.C. 2953.23(A)(1).
 {¶ 80} Post-Trial Affidavit Testimony
 {¶ 81} Appellant attached affidavits from the following individuals to his successive petition for postconviction relief: (1) trial counsel George Keith and Peter Cahoon; (2) first postconviction relief counsel John Gideon; and (3) Dr. Richard Ofshe, a professor specializing in wrongful convictions.
 {¶ 82} The affidavits of appellant's trial counsel relate to evidence which, in their recollection, was not provided during the discovery process. This information, however, was available at the time of the filing of appellant's first postconviction relief petition in which he asserted prosecutorial misconduct, withholding of exculpatory evidence, and ineffective assistance of counsel. While appellant did not support his claims in his first *Page 28 
petition with this information, this omission does not transform the affidavits into material he was unavoidably prevented from discovering. Furthermore, as detailed under our analysis of the specificBrady evidence submitted in support of the instant petition, the evidence is insufficient to meet the second prong of the R.C.2953.23(A)(1) analysis.
 {¶ 83} Attorney Gideon's affidavit sets forth the procedure he used in preparing appellant's first postconviction petition. Attorney Gideon avers that, after reading the 2006 Cleveland Plain Dealer article relating to appellant's case, Attorney Cahoon failed to provide him with evidence which could have been used in support of the petition. As discussed under our analysis of appellant's ineffective assistance of counsel evidence, to the extent trial counsel had this evidence in their possession, we do not believe appellant was unavoidably prevented from discovering it. However, assuming trial counsel's failure to turn over the evidence to Attorney Gideon meets the "unavoidable prevention" prong, we still hold the evidence was insufficient to clearly and convincingly show its presence at trial would have precluded a reasonable factfinder from rendering a guilty verdict.
 {¶ 84} Finally, Dr. Ofsche's affidavit discusses aspects of how witnesses Butch Wolcott and Gary St. Clair were susceptible to deceptive of coercive trial tactics. It further discusses inconsistencies and omissions in various witness statements and testimony. Information in an affidavit that sets forth facts discoverable before trial fails to satisfy the condition in R.C. 2953.23(A)(1)(a) that appellant be "unavoidably prevented" from discovering those facts. State v.Gulertekin (June 8, 2000), 10th Dist. No. 99AP-900, 2000 Ohio App. LEXIS 2412, *6. Here, the theories upon which Dr. Ofshe's averments are based were available and could have been utilized by trial *Page 29 
counsel at the time of trial and thus fail to meet the first element of R.C. 2953.23(A)(1).[5] Thus, the trial court did not abuse its discretion in overruling appellant's successive petition for postconviction relief.
 {¶ 85} New Trial Motion
 {¶ 86} Appellant next challenges the trial court's dismissal of his motion for a new trial. Crim. R. 33(A)(6) provides that a new trial may be granted when new evidence material to the defendant is discovered which he or she could not with reasonable diligence have discovered or produced at trial. See, also, R.C. 2945.79(F). A defendant is also entitled to a new trial where misconduct by the prosecution materially affects his or her substantial rights. Crim. R. 33(A)(2); see, also, R.C. 2945.79(B). If a party seeks to file a motion for a new trial based upon newly discovered evidence and the purported discovery is more than one hundred twenty days past the date of the verdict, the party must seek leave from the court by demonstrating, by clear and convincing proof, that he or she was unavoidably prevented from the discovery of the evidence upon which he or she relies. Crim. R. 33(B).
 {¶ 87} A trial court's ruling on a motion for a new trial based upon newly discovered evidence is within the sound discretion of the trial court and will not be reversed save an abuse of discretion. State v.Williams (1975), 43 Ohio St.2d 88, paragraph two of the syllabus. *Page 30 
 {¶ 88} In order to warrant a new trial based upon newly discovered evidence, a party must show the new evidence:
 {¶ 89} "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." State v. Petro (1947), 148 Ohio St. 505, at syllabus.
 {¶ 90} Under the circumstances of this case, appellant was required to demonstrate he was unavoidably prevented from discovering the evidence upon which his new trial motion is based. As discussed above, much of the evidence at issue could have been discovered prior to the filing of his motion for a new trial. However, assuming arguendo appellant is able to meet his threshold burden, we nevertheless hold the evidence at issue does not meet the Petro factors. By referring to our analysis of the issues as they related to appellant's successive motion for postconviction relief, we hold: (1) the evidence fails to reveal a strong probability of acquittal on the charges; and (2) much of the evidence is cumulative of what was presented at trial or merely impeaches or contradicts the evidence presented by the state at appellant's trial. The trial court therefore did not abuse its discretion in overruling appellant's motion for a new trial.
 {¶ 91} Appellant's first assignment of error is overruled.
 {¶ 92} Issues of Discovery and Expert Assistance
 {¶ 93} Appellant's second assignment of error reads: *Page 31 
 {¶ 94} "The trial court erred in dismissing appellant's postconviction petition without first affording him the opportunity to conduct discovery and providing funds to employ an expert."
 {¶ 95} Appellant asserts the trial court's decision to dismiss his successive petition and/or motion for a new trial without granting him discovery or funds to obtain an expert was inappropriate to the extent he met the standard for an evidentiary hearing. However, even if he had not met the requisite standard, he asserts dismissal was improper without first providing him an opportunity to conduct discovery and providing necessary funds to retain an expert.
 {¶ 96} State postconviction review is not a right of constitutional dimension. State v. Kinley (1999), 136 Ohio App.3d 1, 7; see, also,State v. Coleman, 2d Dist. Nos. 04CA43 and 04CA44, 2005-Ohio-3874, at ¶ 43. Accordingly, a petitioner for postconviction relief has no greater rights than those granted by the postconviction relief statute.State v. Calhoun, 86 Ohio St.3d 279, 281, 1999-Ohio-102. While R.C. 2953.23 sets forth the requirements enabling a court to entertain a successive postconviction relief petition, it does not afford a petitioner the luxury of discovery of funds for an expert in attempting to meet these requirements. As such, the decision to grant or deny discovery and, by implication, release funds for the appointment of an expert in postconviction proceedings rests within the sound discretion of the trial court. See State v. Jackson, 11th Dist. No. 2004-T-0089,2006-Ohio-2651, at ¶ 21.
 {¶ 97} Significantly, this court has held that if a petitioner fails to state adequate grounds to warrant a hearing, a trial court does not abuse its discretion in overruling a request for discovery or appointment of an expert. Id. at ¶ 21 and ¶ 25; see, also State v. *Page 32 Samatar, 10th Dist. No. 03AP-1057, 2004-Ohio-2641, ¶ 21; State v.Getsy (Oct. 22, 1999), 11th Dist. No. 98-T-0140, 1999 Ohio App. LEXIS 4975, *27. Appellant failed to meet the requirements set forth under R.C. 2953.23(A)(1)(a) and (b) justifying a hearing on his successive petition. As a result, the trial court did not abuse its discretion in disallowing discovery and denying appellant funds to appoint an expert.
 {¶ 98} Appellant's second assignment of error is overruled.
 {¶ 99} Lack of an Evidentiary Hearing
 {¶ 100} Appellant's Third assignment of error provides:
 {¶ 101} "The trial court erred in dismissing appellant's postconviction petition and new trial motion where he presented sufficient operative facts to merit an evidentiary hearing."
 {¶ 102} Appellant asserts the trial court committed error in dismissing his successive petition for postconviction relief without holding an evidentiary hearing. However, as we have found no error with the trial court's decision that it lacked jurisdiction under R.C. 2953.23(A)(1), it follows that the trial court did not err in failing to conduct a hearing. State v. Martin, 10th Dist. No. 05AP-495,2006-Ohio-4229, at ¶ 23; see, also, State v. Peoples, 1st Dist. No. C-050620, 2006-Ohio-2614, at ¶ 10 (holding a trial court "need not conduct a hearing on a postconviction claim that the court has no jurisdiction to entertain."). Moreover, under appellant's first assignment of error we determined the trial court did not err in dismissing appellant's motion for a new trial to the extent appellant failed to meet each of the Petro factors; as such, we hold it similarly did not err in not conducting a hearing on the motion.
 {¶ 103} Appellant's third assignment of error lacks merit. *Page 33 
 {¶ 104} Civ. R. 60(B) Issues
 {¶ 105} Appellant's fourth assignment of error asserts:
 {¶ 106} "The trial court erred when it found that Noling could not avail himself of Ohio R. Civ. P. 60(B)."
 {¶ 107} Under his final assignment of error, appellant challenges the application of the one year limitation period barring his motion for relief from judgment under Civ. R. 60(B)(2) and (3).
 {¶ 108} Civ. R. 60(B)(2) provides that the court may relieve a party from a final judgment when there is newly discovered evidence which in the exercise of due diligence could not have been discovered in time for trial. Under Civ. R. 60(B)(3) the same relief is available if the moving party demonstrates misconduct by an adverse party. To prevail on his motion, appellant was required to demonstrate he had a meritorious defense, that he was entitled to relief under Civ.R 60(B)(2) or (3), and that he moved the court for relief not more than one year after the judgment. Id.
 {¶ 109} If any of the foregoing requirements is not met, the motion must be overruled. Rose Cevrolet, Inc. v. Adams (1988),36 Ohio St.3d 17, 20. An appellate court reviews a trial court's ruling on a Civ. R. 60(B) motion for an abuse of discretion. Griffey v. Rojan (1987),33 Ohio St.3d 75, 77. Absent a clear showing of an abuse of discretion, the lower court's decision will not be disturbed on appeal. Lewis v.Blair (1996), 110 Ohio App.3d 342, 345.
 {¶ 100} A court does not possess the discretion to enlarge the time-limit set forth under Civ. R. 60(B)(1), (2), or (3). Civ. R. 6(B). Therefore, a movant under Civ. R. 60(B)(2) or (3) may file his or her motion within a "reasonable time," but not beyond the *Page 34 
one-year time limitation set forth in the rule. Civ. R. 6(B); see, also,Verbanic v. Verbanic (1992), 83 Ohio App.3d 327, 332 (wherein this court held one-year time bar applied to Civ. R. 60(B)(2) motion); Austin v.Payne (1995), 107 Ohio App.3d 818 (one-year time bar applied to Civ. R. 60(B)(3) motion). Moreover, where, as here, a movant bases his or her motion upon alleged newly discovered evidence, the one year period runs from "the judgment from which relief is sought, and not [from] the time the time of discovery of the new evidence." Strack v. Pelton,70 Ohio St.3d 172, 175, 1994-Ohio-297.
 {¶ 111} Appellant alleges the trial court's decision to overrule his Civ. R. 60(B) motion was inequitable and tantamount to an unconstitutional suspension of habeas corpus. We disagree with the manner in which appellant frames the issue. As evidenced by the filing of his successive postconviction relief petition and his motion for new trial, Civ. R. 60(B) was not the only available procedural channel to which appellant could avail himself. As such, the trial court's denial of appellant's Civ. R. 60(B) motion did not preclude him from raising arguments relating to the alleged newly discovered evidence or alleged misconduct on the part of the prosecution. Rather, it merely followed the putative legal principle that motions filed pursuant to Civ. R. 60(B)(2) and (3) must be made within one-year. As appellant had utilized other procedural outlets to voice his arguments, the trial court's decision was neither inequitable nor equivalent to a suspension of habeas corpus.
 {¶ 112} Appellant additionally asserts that, regardless of the procedural problems inhering his motion, he was, at minimum, entitled to a hearing on his motion. This assertion is analogous to appellant's contention under his third assignment error. We reject the instant argument for the structurally similar reasons as those discussed under *Page 35 
that assigned error. When a party fails to meet the requirements for filing a Civ. R. 60(B) motion, it stands to reason the motion must fail. As emphasized supra, all conditions set forth under Civ. R. 60(B) must be met, else the motion shall be overruled as a matter of law. Appellant failed to meet a facial condition of filing his motion, viz., the one-year limitation requirement. Accordingly, the trial court was neither obligated nor, according to Civ. R. 6(B), vested with the discretion to allow a hearing on the motion. Therefore, the trial court did not err in denying appellant relief under Civ. R. 60(B).
 {¶ 113} Appellant's fourth assignment of error is without merit.[6]
 {¶ 114} For the reasons discussed herein, appellant's four assignments of error are overruled and the judgment of the Portage County Court of Common Pleas is hereby affirmed.
DIANE V. GRENDELL, P.J., MARY JANE TRAPP, J., concur.
[1] Mellon testified before the grand jury, but not at trial.
[2] Dr. Cannone's statement was attached as an exhibit in appellant's first postconviction petition. In that case, appellant alleged his trial counsel was ineffective for failure to investigate the possibility of an alternative suspect in light of Dr. Cannone's statement and Lehman's admission that he had once owned a weapon of the same caliber used in the murders. This court overruled the allegation using the doctrine of res judicata; in addition, this court stated: "It is unclear whether this evidence was part of the record at the time appellant pursued an appeal from his convictions. Nevertheless, even if it were not, this court cannot say that his attorneys were ineffective for failing to present it to the jury. The connection between the other suspect and the murders is tenuous at best. Therefore, appellant's attorneys may have made a reasoned tactical decision to not present this theory as part of appellant's defense, and appellant has not explained how this decision prejudiced him." Noling II, at ¶ 68.
[3] Appellant alleges the victims' phone records were not released. The available records were submitted as an exhibit in the instant matter. Appellant contends the records would have assisted in ascertaining whether Mr. Hartig made a phone call to his insurance agent described in Dr. Cannone's statement. While the exhibit is purportedly incomplete, a review of the records submitted does not reveal any such call. Even if the call was made, however, we fail to see how such a detail would provide any additional merit to appellant's allegation that an alternative suspect, i.e., either Lehman, LaFever, or both, committed the crimes.
[4] Moreover, according to the defense investigator it was also information trial counsel possessed prior to trial. In this respect, the report would also fail the first prong of the statutory test.
[5] Although appellant alleges that all the evidence viewed cumulatively provides strong support for his assertion that he did not commit the crimes for which he was convicted, the trial court dismissed appellant's action and thus did not reach the merits of this assertion. Because our review is limited to the trial court judgment entry, which we believe properly dismissed the matter for failure to meet the jurisdictional requirements of R.C. 2953.23(A)(1), we shall not discuss the substantive effect of appellant's submissions.
[6] We note that appellee asserts this court's holding in State v.Schlee, 11th Dist. No. 2005-L-105, 2006-Ohio-3208 is controlling over this issue. However, Schlee is distinguishable from the matter sub judice. In Schlee, this court held the trial court properly recast a party's Civ. R. 60(B) motion as a petition for postconviction relief. This court observed that because there was an applicable statute appellant could use to present his claims, he did not need to look to the civil rules for relief. Schlee at ¶ 27-29. Here, the trial court did not recast the motion but, rather, dismissed the motion for failure to meet a necessary condition of filing. In this respect, the procedural history of Schlee differs from that of the instant case. Moreover, the appellant herein had contemporaneously filed a successive postconviction petition and a Crim. R. 33 motion with his Civ. R. 60(B) motion and thus was in the process of utilizing all available remedies. Under these circumstances, Civ. R. 60(B) was an appropriate additional mode of relief available to appellant. We therefore believe it inappropriate to follow the reasoning in Schlee. *Page 1